*In re* MARRIAGE OF MARIANNE MORAN, Plaintiff-Appellant, and JOHN McELROY MORAN, Defendant-Appellee.

First District (1st Division)   No. 84—816

Opinion filed September 9, 1985.—Rehearing denied October 10, 1985.

Feiwell, Galper & Lasky, Ltd., of Chicago (Michael J. Berger and Andrew D. Eichner, of counsel), for appellant.

Rosenfeld, Rotenberg, Schwartzman, Hafron & Shapiro, of Chicago (Howard H. Rosenfeld and Alan M. Goldberg, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

On July 26, 1983, the trial court entered a judgment dissolving the marriage of petitioner Marianne Moran (Marianne) and respondent John McElroy Moran (John). Incorporated into the judgment was the parties' marital settlement agreement. On August 24, 1983, within 30 days of the entry of the judgment, Marianne filed a motion to vacate the judgment, alleging that the settlement agreement was obtained by fraud, duress and coercion and was unconscionable. Following an evidentiary hearing, the trial court denied Marianne's motion to vacate, and this appeal followed. For the following reasons, we reverse and remand.

The parties were married in June 1956. At the time Marianne filed her petition to dissolve the marriage in November 1981, she was 47 years old and John was 50 years old. When the judgment for dissolution was entered, the parties had been married for 27 years, Marianne was an unemployed housewife and John was a cardiovascular surgeon and professor at Northwestern Medical School. At that time, the parties' four sons were ages 17, 19, 23 and 25.

At the hearing on her motion to vacate, Marianne testified that in January 1983 she changed her attorneys in the dissolution proceeding because she was dissatisfied with the progress being made. She retained Edward Rosenberg (Rosenberg) and the law firm of Lake, Rosenberg & Associates. On January 25, 1983, Marianne met with Rosenberg to discuss her demands for settlement. She advised him she wanted to sell the marital home in Riverside and the parties' jointly owned condominium on Chestnut Street in Chicago. She told Rosenberg she wanted to share equally in the marital estate and 12 years of maintenance. At that meeting, Marianne signed a retainer agreement for $5,000.

On March 10, 1983, Marianne met with Rosenberg and complained that John was not paying the bills on time and she had to repeatedly ask him for money. Rosenberg told Marianne to see Stuart Levin, an accountant, to review John's tax returns and finances because "there might be more money than her husband was showing." Later that month, she met with Levin for approximately 50 minutes and paid him a $1,000 retainer. She never had any further communication with him or saw any documents prepared by Levin on her behalf.

On May 25, 1983, Rosenberg retook John's deposition pursuant to a court order (John's deposition previously had been taken by Marianne's prior attorney). As of that date, Marianne stated she had not seen any discovery or documentation from Rosenberg relating to

John's finances.

Marianne testified that on July 12, 1983, she went to Rosenberg's office to discuss what she thought would be preparation for her trial, then scheduled for July 18, 1983. When she walked into Rosenberg's waiting room, she stated she was shocked to see John sitting there. At that meeting, Rosenberg gave her a settlement agreement which he told her to sign. She testified that prior to this time Rosenberg never discussed the terms of any proposed settlement with her nor reviewed any documentation as to John's income or assets.

Marianne reviewed the settlement agreement at that time with Rosenberg and his partner, Steve Lake. The agreement provided that she receive the marital home which was valued by John at $400,000. Marianne told Rosenberg she did not want the home because when it was sold she would incur a large real estate fee and a substantial capital gains tax. She also objected to the value of $400,000 placed on the home, and Rosenberg gave her the name of an appraiser to have the house appraised. Marianne testified she told Lake the agreement was unfair, but Lake informed her it was a "good deal." Marianne stated that Rosenberg then told her that John's attorney was one of the best trial lawyers, making her lose confidence in Rosenberg. She also questioned Rosenberg about the $25,000 fee that John was to pay him under the agreement, but was not given any explanation. Marianne further testified that at the meeting Rosenberg and Lake repeatedly mentioned the case of *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 426 N.E.2d 1066, and, in particular, how the wife in *Asch* received only $45,000 and three years of maintenance.

The following day, Marianne wrote Rosenberg a letter objecting to the agreement and the way she was treated at the meeting. In the letter, which was admitted into evidence, Marianne questioned, among other things, Rosenberg's $25,000 fee, and the amounts in the Kemper, Stein Roe and CREF-TIAA accounts reflected on John's affidavit.

On July 15, 1983, Marianne met with Rosenberg and gave him an appraisal valuing the marital home at $245,000. Marianne complained that since the house was not worth $400,000, she should get some money up front, as Rosenberg promised her earlier. Marianne testified that Rosenberg began shouting and screaming at her. Rosenberg then told her she would clear $200,000 from the sale of the house and if she invested that money it would double in five years. At the suggestion of Rosenberg, Marianne called Peggy Fawcett at the First National Bank to confirm that the $200,000 would double. Fawcett advised Marianne that she would only earn $81,000 after five years.

Marianne told Rosenberg what Fawcett said, and Rosenberg told her she was wrong and that the *Asch* case and ERA changed everything for women. Marianne stated the meeting ended with Rosenberg shouting at her and telling her that the proposed settlement was a good deal. When Marianne asked if the trial could be postponed, Rosenberg responded that her husband "would freeze her out."

On July 19, 1983, Marianne stated she wrote Rosenberg a second letter because she believed she was being harassed into entering the settlement agreement. In the letter, which was admitted into evidence, Marianne again advised Rosenberg she wanted both the marital home and Chestnut Street condominium sold and wanted the stocks, and the Stein Roe, Kemper, and CREF-TIAA accounts divided equally. She also requested 10 years of maintenance. Rosenberg never responded to this letter nor the letter of July 13, 1983.

On July 20, 1983, Marianne attended the first pretrial conference with Rosenberg accompanied by her friend, Barbara Purdy. She testified that she wanted Purdy, a housewife, to accompany her and act as her "spokesman" because she felt "very, very dense and dull and not very articulate and very sick." Marianne stated that at the pretrial conference, the judge advised her that ERA had really changed things for women and that she could do no better at trial, but much worse.

The second pretrial conference was held on July 25, 1983. The trial court did not permit Purdy to attend this conference. Marianne stated that the judge told her about the *Asch* case, and that under that decision she could very well end up with only five years of maintenance. The judge again told her the settlement agreement was the best she could do and that her attorney would lose if she went to trial.

Following the pretrial conference, Marianne returned to Rosenberg's office with Purdy. Marianne asked Rosenberg to give her a letter cancelling the balance of her retainer agreement since John was paying him $25,000. Rosenberg began shouting at her and then dictated a letter to his secretary, as if written by Marianne, terminating his services. Marianne stopped him from completing the letter, and he dictated a new letter cancelling the balance on the retainer agreement only on the condition that Marianne enter into the settlement "now" and that "John agrees to pay Rosenberg $25,000." Rosenberg told Marianne to sign the settlement agreement, which she did, and promised there would be more changes in the agreement.

The following day, which was the day of the prove-up, Marianne returned to Rosenberg's office with her friend Thea Kiwiet. Marianne testified she was not feeling well that day and was under medication,

and that Rosenberg was aware of this fact. She told Rosenberg she was worried because there were many things wrong with the agreement. In particular, she was concerned that the mortgage payments on the home would drain her maintenance.

Marianne, Kiwiet and Rosenberg subsequently went to court for the prove-up. Immediately prior to the prove-up, Marianne testified that Rosenberg told her to say either yes or no and "don't cause a fuss." Following the prove-up, the court entered a judgment dissolving the marriage and incorporating the settlement agreement. Under the judgment, Marianne received the marital home and seven years' maintenance, while John received virtually all of the parties' remaining assets. Marianne was responsible for the mortgage payments and the real estate commission incurred in selling the home.[1] John guaranteed a sales price of $300,000 on the home.

Marianne called John as a hostile witness at the hearing to vacate. John testified he represented in his sworn affidavit that his income was $180,000 plus bonus. He knew the amount of his bonus at that time but did not include it in his affidavit. John also stated he knew there was more money in his various deferred income and retirement accounts than reflected in his affidavit, but he did not attach more recent statements because his attorney advised him not to.

Marianne also called Barbara Purdy and Thea Kiwiet as witnesses. Purdy corroborated Marianne's testimony as to the events that occurred at the meetings and prove-up on July 26, 1983. Purdy testified she was appalled by the judge's treatment of Marianne at the first pretrial conference. Kiwiet corroborated Marianne's testimony as to the events occurring at the meeting and prove-up on July 26, 1983.

Rosenberg was the only witness called by John at the hearing. Rosenberg testified that he did not exercise any duress or coercion on Marianne, that she was of sound mind and not under the influence of any drugs, and that she had urged him to settle her case. Rosenberg also testified he sent John a notice to produce documents on June 8, 1983, but no documents were ever produced. On July 14, 1983, he filed a motion for sanctions to compel production of the documents, but never presented the motion in court. He stated that he never really sought the documents requested in these motions and that they were just "hot pokers" designed to bring the case to a head.

---

[1]The outstanding balance on the mortgage is approximately $26,000. The judgment for dissolution provides that if the marital residence is not sold within 18 months of the entry of the judgment, John shall thereafter pay all mortgage payments.

Rosenberg testified that he sent out only two subpoenas, dated June 17, 1983. One subpoena was issued to Loyola Medical Center, where John had not been employed since 1977. In response to this subpoena, Rosenberg received a 1977 W-2 form. The second subpoena was issued to Northwestern Medical Association, John's employer. In response to this subpoena, John received a letter from one of Northwestern's attorneys. Rosenberg considered the response insufficient and wrote the attorney a letter advising him of noncompliance with the subpoena.

Rosenberg did not refute that prior to July 12, 1983, the date Marianne was presented with the settlement agreement, he never discussed the terms of any settlement with her or received any documentation as to John's income or assets. He also did not rebut Marianne's testimony as to the discussions that took place at the pretrial conferences on July 20 and July 25, 1983, or that he threatened to terminate his representation of Marianne on the eve of trial. Finally, Rosenberg never denied telling Marianne to sign the agreement, promising there would be more changes.

Following the hearing, the court entered an order on March 1, 1984, denying Marianne's motion to vacate the judgment of dissolution. The sole issue in this appeal is whether the denial was erroneous.

■ Initially, we recognize that in Illinois the law looks favorably upon the amicable settlement of property rights between a husband and wife prior to the dissolution of their marriage. (*In re Marriage of Perry* (1981), 96 Ill. App. 3d 370, 373, 421 N.E.2d 274.) Pursuant to section 502(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 502(b)), however, the settlement can be set aside by the court if it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the separation agreement is unconscionable. (*In re Marriage of Foster* (1983), 115 Ill. App. 3d 969, 971, 451 N.E.2d 915.) Additionally, section 502(b) does not eliminate many of the traditional grounds for setting aside settlement agreements, including grounds of fraud, duress, coercion and violation of any rule of law, public policy or morals. *In re Marriage of Foster* (1983), 115 Ill. App. 3d 969, 971; *Reininger v. Reininger* (1978), 67 Ill. App. 3d 21, 23, 384 N.E.2d 546.

In the present case, we believe that the property settlement must be set aside because of the misrepresentation, duress and coercion practiced upon Marianne. The record establishes that Marianne had no input into the drafting of the settlement agreement prior to the

time it was presented to her on July 12, 1983. From that date until the day of the prove-up on July 26, 1983, she continually objected to the contents of the agreement. She also questioned John's affidavit which contained outdated values for most of the assets and no values for other assets. Rosenberg responded by telling her she "got a good deal" and that John's attorney was one of the best trial lawyers. It was undisputed that on July 15, 1983, when she asked for a continuance, Rosenberg replied that "John will freeze you out."

It was further uncontroverted that Rosenberg threatened to quit on the eve of trial and dictated a letter to his secretary, as if written by Marianne, terminating his services. Marianne stated she stopped him from completing the letter because it was only one day prior to trial and she was scared. Rosenberg dictated a new letter cancelling the $4,000 due on the retainer. That letter, however, voided the retainer only on the condition that Marianne enter into the agreement "now" and that John pay Rosenberg a $25,000 fee. It was undisputed that Rosenberg then told Marianne to sign the settlement agreement, promising there would be more changes. Marianne testified she signed the agreement because it was the final trial date, she had nowhere else to go and she did not know whom to trust at that point. Only relatively minor changes were thereafter made in the agreement.

It is apparent that Rosenberg was financially motivated to induce Marianne to agree to the proposed settlement. The $25,000 fee that John was to pay him if she signed the agreement was quite excessive when considering the relatively small amount of time and effort Rosenberg exerted on Marianne's behalf. Marianne stated she attended only seven office conferences with him prior to July 12, 1983, the date when she was presented with the settlement agreement, although the exact number of meetings is disputed by Rosenberg. Rosenberg appeared in court on merely four occasions, only one of which involved a contested motion. Rosenberg admittedly undertook little discovery in this case. He sent out only two subpoenas, both of which were virtually useless, and retook John's deposition. He never presented his motion to compel sanctions against John when he failed to produce documents, and Marianne never saw any financial documentation obtained by Rosenberg as to John's finances. The accountant Rosenberg recommended also did virtually nothing on her behalf, even though he was paid a $1,000 retainer. He only met with Marianne once and never prepared any reports or other documents on her behalf.

We are cognizant that Rosenberg testified that Marianne was tired of having her divorce drag on and that she instructed him to set-

tle her case rather than proceed to trial. However, the letters Marianne wrote to Rosenberg discredit his testimony and substantiate Marianne's testimony with respect to the coercion exerted by him. In her letter of July 12, 1983, Marianne stated:

"Ed, I really thought you were on my side *** until yesterday ***. I though you were willing to go to bat for me and you wanted a trial. I know that Howard [John's attorney] is one of the best trial lawyers. You did not need to say that. I have heard it. Why did you think I came to you????"

The letter concludes:

"I am sorry you feel this is the best deal and run. I do not feel that way ***, I would like to get a fair deal *** in or out of Court ***. I would rather spend more on lawyer's fees and feel I got a fair deal and what I want in most respects, than to be shipped off with what I do not want ***."

Marianne's letter of July 19, 1983, which was written following her meetings with Rosenberg on July 15 and July 18, 1983, further discredits his testimony. In this letter, she states:

"We never found time to discuss what I thought would be a fair arrangement and only seem to have spent three times redoing the one ROSENFELD [John's attorney] came up with ***."

Although John urges this court to discount the letters, we believe they provide persuasive documentary support for Marianne's testimony. The letters were written contemporaneously with the relevant events that occurred, and there was no reason for Marianne to be untruthful at that point in the proceedings.

John argues that Marianne never objected to the settlement at the prove-up before the trial judge. It was undisputed, however, that at the prove-up Rosenberg instructed Marianne to answer his questions either yes or no and "don't cause a fuss." Marianne testified:

"By that time, I felt totally beaten down anyhow, and I did not know there would be any recourse, and I went in there and I said 'yes' and 'no' and I did not cause a fuss, and then we went home ***."

The undisputed evidence further discloses that the trial court misled Marianne and coerced her into signing the settlement agreement. The court advised Marianne that under the case of *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 426 N.E.2d 1066, she would not be entitled to more than five years of maintenance. The court, however, mischaracterized the holding in *Asch*. Marianne was never told that while the wife in *Asch* was awarded only three years of maintenance, the trial court in that case retained jurisdiction to review the award

at the end of three years. Although this review concept has become quite common (see *In re Marriage of Carney* (1984), 122 Ill. App. 3d 705, 716-17, 462 N.E.2d 596), it was never explained to Marianne. Under the property settlement in this case, Marianne's maintenance is substantially reduced after five years and terminates after seven years with no review. We must also point out that John's yearly salary is approximately five times the annual salary of the husband in *Asch*.

The trial court also coerced Marianne into signing the agreement by repeatedly warning her that the agreement was the best she could do and that her attorney would lose if the case went to trial. We initially observe that the court made these warnings without even having evidence as to the actual values of most of the parties' assets. Outdated figures were listed in John's affidavit for the deferred income and retirement accounts, while no values were placed on the various tax shelters, stock and certain real estate. Nor did the trial court know John's total annual salary from Northwestern Medical Center, since John failed to include the amount of his bonus in his affidavit even though he admittedly knew the amount when he submitted his affidavit. Additionally, John's medical practice was never valued. See *In re Marriage of Davis* (1985), 131 Ill. App. 3d 1065, 476 N.E.2d 1137.

Nevertheless, even based upon the limited evidence of valuation now before us we believe that, contrary to the trial court's warnings, Marianne certainly could not have done any *worse* at trial. If this case had proceeded to trial, the court would have been required to divide the property in "just proportions" with regard to all relevant factors, including the duration of the marriage, the respective economic circumstances of each spouse and their reasonable opportunity for future acquisition of capital assets and income. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c).) The settlement agreement in this case by no means divides the parties' property in "just proportions," but rather is manifestly unfair and unconscionable when considering the parties' relative circumstances and station in life. John, a cardiovascular surgeon in the prime of his career, testified he would earn $191,000 during the 1983 fiscal year. Marianne, on the other hand, is an unemployed housewife who never had employment outside the home during the parties' marriage. The only asset of any significant value that Marianne was awarded is the marital home, subject to the mortgage payments she must pay. The settlement agreement provides she is to receive five years of maintenance at the rate of $3,333 per month and two years of maintenance at the rate of $1,666 per month. The main-

tenance payments are to be included in Marianne's gross income and are tax deductible to John.

After 27 years of marriage and raising the parties' four children, Marianne should be entitled to more than five years of maintenance at 40,000 taxable dollars and two years of maintenance at 20,000 taxable dollars, considering that John has an annual gross income of nearly $200,000 and was awarded virtually all of the remaining assets. John received the Chestnut Street condominium, property in North Dakota and Minnesota, all of the tax shelters, all retirement and deferred income accounts, and all stocks (including 181 shares of AT&T, 289 shares of Northwest Bancorporation and 200 shares of Standard Oil of California). These assets are substantial. John valued the condominium at $57,000, the North Dakota property at $60,000 and the Kemper money market funds at approximately $35,631. Updated evidence submitted by Marianne's new counsel at the hearing to vacate showed a total value of approximately $173,230 for the three Stein Roe Funds and a value of $130,192 for the CREF-TIAA fund. The record also showed that as of June 30, 1983, approximately $90,000 had accrued in Northwestern Medical Foundation retirement benefits. The combined value of these few assets alone is almost double the value of the property received by Marianne—and this figure does not even include the Minnesota property,[2] tax shelters and stock awarded to John. Given the lengthy duration of the parties' marriage and John's superior opportunity for the future acquisition of assets and income, Marianne certainly was entitled to receive more property pursuant to the Act. The trial court clearly misled her by warning her she could do no better at trial.

■ We further note that it is undisputed that the trial court told Marianne that if she was untrained, then how could she possibly have contributed to her husband's career. This statement was also misleading. Under the Act, Marianne's contributions as a homemaker and parent during the 27-year marriage are to be considered in dividing marital property; it is held that the marital relationship is to be viewed as a shared enterprise or partnership. (*In re Marriage of Komnick* (1981), 84 Ill. 2d 89, 417 N.E.2d 1305.) Additionally, Marianne testified her father gave them substantial monthly payments during the first five years of their marriage when they were struggling to make ends meet, and that she had contributed considerable funds and furnishings that she inherited. Marianne obviously needed

---

[2]Although John claims the Minnesota property is nonmarital, Marianne maintains the property was purchased with joint funds and is marital property.

no special training to make these contributions.

Other examples of the subtle coercion by the trial court are illustrated in the colloquy during pretrial on June 25, 1983, wherein Marianne complained that the value of the household furniture being given to her was closer to $5,000 than to John's evaluation of $75,000 and the trial court responded, "Your house must look like a dump," and when Marianne complained that no consideration was being given to the fact that John, in dissipation of the family's assets, had lavished gifts on his paramour in excess of $10,000, to which the trial court replied, "That was peanuts." Little wonder that on July 26, 1983, the day of trial, Marianne surrendered and agreed to an unconscionable settlement.

The facts in the instant case are strikingly similar to *James v. James* (1958), 14 Ill. 2d 295, 305, 152 N.E.2d 582, where our supreme court set aside a property settlement, reasoning that "its accomplishment does not clearly appear to have been entirely free from coercion and misrepresentation." In *James*, as in this case, the wife alleged that the trial court made certain misleading statements concerning the law in order to exert pressure on her to settle. These statements included informing her that $200 a month was the maximum amount of support for two children and that she would have no claim by reason of her joint interest in the residence unless she worked and contributed to its purchase. The wife in *James*, as in the present case, was also directed during the prove-up to respond to certain questions by stating yes or no. In *James*, the wife was also told by her attorneys that she had to settle the case because the matter had been set for hearing. Similarly, in the instant case, Marianne asked Rosenberg if the case could be continued so that more changes could be made to the settlement agreement and Rosenberg responded that John "will freeze you out."

Finally, in *James*, despite the fact that the settlement agreement was preceded by negotiation, its execution was neither studied or deliberate and during negotiations the wife manifested her dissatisfaction with the settlement. In the instant case, Marianne was not even involved in any negotiations prior to the time she was given a draft of the agreement on July 12, 1983. The record shows that thereafter only relatively minor changes were made in the agreement and that Marianne continuously complained and objected to the agreement up to and including the day the judgment of dissolution was entered. John argues that Marianne accepted maintenance following the judgment and did not return it, while the wife in *James* returned the benefits she received. We believe that in all fairness, under the circum-

stances before us, this factor does not serve as a release of error. Marianne was unemployed and was entitled to some support pending appeal. We further cannot say that her receipt of maintenance prejudiced John in any manner. *In re Marriage of Reib* (1983), 114 Ill. App. 3d 993, 1003, 449 N.E.2d 919.

The extreme coercion and duress by court and counsel mandate that the portion of the judgment of dissolution approving and incorporating the marital settlement agreement be and is reversed and the cause is remanded for a new trial as to the property and maintenance provisions.

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.