*In re* MARRIAGE OF SUSAN HAMM-SMITH, Petitioner-Appellee, and
LEWIS DANIEL SMITH, Respondent-Appellant.

Fourth District   No. 4—93—0859

Opinion filed May 5, 1994.

E. Frederick C. Gain, of Springfield, for appellant.

William T. Panichi, of Springfield, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Lewis Daniel Smith appeals from the trial court's denial of his petition, brought pursuant to section 2—1401 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1991, ch. 110, par. 2—1401), to vacate a judgment of dissolution of marriage. He alleges the trial court failed to consider whether the settlement agreement was unconscionable within the meaning of section 502(b) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (Ill. Rev. Stat. 1991, ch. 40, par. 502(b)). He additionally alleges the trial court erred in declining to set aside the judgment on the basis of duress, fraud, unconscionability or other grounds. We disagree and affirm.

## I. FACTS

Lewis married Susan Hamm-Smith on September 1, 1984. Lewis and Susan have no children. During their nine-year marriage, both parties were employed as salespersons and earned substantial incomes. Susan also inherited $60,000 during the marriage. By virtue of their incomes and Susan's inheritance, the parties acquired various assets, the most significant of which are the marital residence, valued at $350,000 to $384,000 and subject to a mortgage of $275,000, and Susan's pension plan valued at $70,000.

Susan, through her attorney, Steven Nardulli, filed a petition for dissolution of marriage on January 5, 1993. Lewis filed his appearance and consent on the same day. A judgment for dissolution of marriage was entered by the court on January 22, 1993. The judgment incorporated a settlement agreement which had been approved by both Susan and Lewis.

On May 26, 1993, Susan filed a petition for a rule to show cause, alleging Lewis had failed to comply with the terms of the judgment. On June 14, 1993, Lewis filed a petition to vacate the judgment pursuant to section 2—1401 of the Code. In his petition, Lewis alleged the judgment ought to be set aside because the terms of the agreement are unconscionable within the meaning of section 502(b) of the Marriage Act.

In support of his petition, Lewis alleged the "judgment was obtained against him by default as Steve Narduli [sic] was the

attorney selected by the wife for both parties," and "[t]he wife hired an attorney only to represent herself and defendant was without benefit of attorney." Lewis contended Susan took advantage of his lack of education and sophistication, causing him to agree to a judgment allocating 100% of the marital property to Susan, and leaving him with only debt. According to Lewis, the settlement agreement "is so excessively one-sided as to amount to a fraud upon the court." Lewis contended Susan represented she would sell the marital home immediately, but actually has no intention of selling it. Finally, Lewis contended, "he has proceeded diligently since learning of the suit and default judgment." The hearing on the petition occurred on August 27, 1993.

With respect to whether attorney Nardulli had been hired to represent both Susan and Lewis, Susan testified she told Lewis Nardulli would represent *her* interests. She never told Lewis Nardulli was his attorney. The judgment of dissolution which Nardulli drafted and Lewis and Susan signed provides: "The Plaintiff [Susan] is present in person and by her attorney, Steven Nardulli. The Defendant [Lewis] filed his Appearance and Consent to these proceedings and is appearing *pro se.*"

Despite the language of the judgment order, Lewis testified he believed he and Susan had agreed Susan would hire one attorney to represent both of them, and he believed Nardulli was his attorney also. On cross-examination he conceded he had never met Nardulli, and never consulted with him regarding the dissolution.

With respect to the education and sophistication of the parties, the following testimony was given. At the time of the dissolution, Susan was 32 and Lewis was 41 years old. She has bachelor of arts degree in marketing, and was employed as a salesperson earning $53,000 per year, plus an average yearly bonus of $10,000. Lewis did not complete high school, but had taken some college courses. When asked if he had ever taken courses in accounting, business or finance, he evaded the question, stating "I'm not a college graduate. I took some college courses, but I'm not a graduate." He is self-employed as a salesman. Until the economic reversals which he suffered in the spring of 1993, he earned yearly gross incomes of approximately $100,000, and had yearly business expenses of approximately $25,000.

Susan testified Lewis told her he wanted a divorce on November 11, 1992. He later moved out of the marital residence, and began living with his girlfriend. In December 1992, Lewis and Susan met to discuss a property settlement. Susan testified, and Lewis conceded, this meeting occurred at his request.

During the property settlement meeting the parties agreed to sell

the marital residence after repairs had been made to the roof. The parties believed they had at least $75,000 equity in the home, and the repairs to the roof would cost approximately $15,000. The parties agreed Susan would be responsible for selling the home, paying the sales commissions, and satisfying the mortgage. She would retain any gain on the sale of the residence and most of the furnishings.

The equity in the home was largely attributable to Susan's contribution of her nonmarital property. Specifically, the down payment on the home consisted of the major portion of Susan's inheritance and the proceeds from the sale of a previous residence. The $10,000 down payment on the previous residence had also been made largely, if not entirely, with Susan's nonmarital funds. The portion of her inheritance which was not used to make the down payment was used for the purchase of the furnishings.

The parties agreed to share the expenses of maintaining the home ($3,000 per month plus real estate taxes) until its sale. Lewis and Susan agreed he earned 60% and she earned 40% of their total income; accordingly, they agreed he would pay 60% and she would pay 40% of the monthly expenses. The parties agreed they would each retain the rights to their own pension plans. Susan's pension plan was valued at $70,000 and Lewis' was valued at $2,000. The parties agreed Susan would keep the stock she held in Pftizer, which was valued at $6,000 to $8,000. Lewis testified he told Susan "It was hers. I said she could have it." Susan also held employee stock options which were valued at $5,000 to $10,000 and could be exercised upon the payment of $21,000. Lewis and Susan agreed she would retain the stock options. Lewis testified that at the time of negotiating the settlement agreement he knew what property the parties owned and the value of the property. Susan agreed to waive any claim to maintenance.

Susan communicated the terms of the agreement to Nardulli, who drafted a judgment of dissolution order incorporating the settlement agreement. Lewis conceded the order drafted by Nardulli did not contain anything he and Susan had not agreed upon. The order provided any extraordinary repairs to the marital residence would be the joint responsibility of the parties. Lewis testified this clause was eliminated at his request because he knew the cost of the repairs to the roof could be substantial and he did not want to pay for them. Lewis also included a list of items he wished to receive. These items included a sailboat, antique rifle, sporting equipment, stereo equipment, a television/VCR, and clothing. Both Susan and Lewis approved the order and signed it on January 5, 1993. Between the signing of the order and the entry of the judgment of dissolution

on January 22, 1993, he contacted her several times per week, inquiring when the dissolution would be finalized.

Susan arranged for the repair of the roof in January 1993. The work began in January, but was not completed until April 1993. She listed the house with a realtor in May 1993. The house is listed for sale for $384,000 and the listing agreement provides for a commission of 6.5% to 7%, depending on whether the listing realtor is also the selling realtor. As of the date of the hearing the house had not been sold.

After the entry of the judgment of dissolution, Lewis married his girlfriend. In the spring of 1993, he suffered economic reversals. He testified the furniture industry, in which he is employed, was suffering as the result of the recession. Although he previously represented two companies, he had resigned his position with one, and suffered a decrease in commissions from the other. He testified it was not until he began to have cash flow problems he determined the settlement agreement was unfair.

The trial court denied Lewis' petition. Specifically, the court found Lewis failed to prove the judgment had been procured through fraud or duress. The court found Nardulli never met Lewis, counseled him, or held himself out to be Lewis' attorney. Lewis filed an appearance and consent in the dissolution proceedings. He *initiated* both the divorce and the settlement negotiations. He agreed to the terms of the settlement agreement and negotiated a change to his benefit. The court additionally found he failed to prove the agreement was unconscionable within the meaning of section 502 of the Marriage Act. The court noted, in determining whether an agreement is unconscionable, it looks to the financial circumstances at the time of making the agreement. Lewis' later economic reversals could not be considered in determining whether the agreement was unconscionable. Lewis appeals from the denial of his petition.

## II. DISCUSSION

■ Lewis has taken the inconsistent positions that (1) he was represented by Nardulli in the dissolution proceedings, and (2) the judgment of dissolution was entered against him by default. The assertion he was represented by Nardulli will be discussed in a later portion of this opinion. At this juncture we note only the judgment of dissolution was *not* entered by default. Lewis filed his appearance and consent to the dissolution proceedings, and entered into an agreed order with Susan. He approved the judgment order and signed it. After signing the order he made several inquiries regarding how soon the order would be entered and the dissolution finalized. Nothing

in the record supports an argument the order was entered by default, or that he lacked knowledge of the contents of the order.

We now turn to Lewis' contention the trial court erred in denying his section 2—1401 petition. A section 2—1401 petition is a petition for relief from a judgment which is brought more than 30 days after the entry of the judgment. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1401(a).) A section 2—1401 petition is the method by which a litigant may bring facts to the attention of the trial court which, if known by the trial court at the time of judgment, would have prevented its entry. *Manning v. Meier* (1983), 114 Ill. App. 3d 835, 837-38, 449 N.E.2d 560, 562.

A section 2—1401 petition is addressed to the sound discretion of the trial court and its decision will not be reversed absent an abuse of discretion. (*National Bank v. Doss* (1986), 141 Ill. App. 3d 1065, 1071, 491 N.E.2d 106, 109-10.) When a party seeks to vacate or modify a property settlement incorporated in a divorce decree, all presumptions are in favor of the validity of the settlement. (*In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 313, 474 N.E.2d 28, 30.) A court should not set aside a settlement agreement merely because one party has second thoughts. *In re Marriage of Steichen* (1987), 163 Ill. App. 3d 1074, 1079, 517 N.E.2d 645, 648.

Grounds for relief under section 2—1401 have traditionally included fraud or duress (see *In re Marriage of Carlson* (1981), 101 Ill. App. 3d 924, 929-30, 428 N.E.2d 1005, 1010), mutual mistake of fact (see *Groak v. Groak* (1965), 64 Ill. App. 2d 439, 442-43, 212 N.E.2d 139, 141), or newly discovered material evidence where the evidence could not have reasonably been discovered at the time of judgment and is so conclusive it probably would change the result (see *Doss*, 141 Ill. App. 3d at 1071, 491 N.E.2d at 110). When the section 2—1401 petition seeks relief from a judgment of dissolution of marriage which incorporated a property settlement agreement, the petitioner may seek relief under these traditional grounds, or on the basis that the settlement agreement is unconscionable within the meaning of section 502 of the Marriage Act. (See *In re Marriage of Gurin* (1991), 212 Ill. App. 3d 806, 811, 571 N.E.2d 857, 861; *Carlson*, 101 Ill. App. 3d at 929-30, 428 N.E.2d at 1010.) Lewis seems to allege on appeal the trial court erred in denying his petition, because the settlement agreement was entered under duress, as the result of fraud, is unconscionable, and the trial court should have been "looking for" other grounds upon which to set aside the agreement.

### A. *Duress*

We reject any contention Lewis entered into the settlement

agreement under duress. Duress has been defined as including the imposition, oppression, undue influence or the taking of undue advantage of the stress of another whereby one is deprived of the exercise of his free will. (*Riedy*, 130 Ill. App. 3d at 314, 474 N.E.2d at 30-31.) The person asserting duress has the burden of proving, by clear and convincing evidence, that he was bereft of the quality of mind essential to the making of the contract. See *In re Marriage of McCaskey* (1988), 167 Ill. App. 3d 860, 865, 522 N.E.2d 300, 303; *Riedy*, 130 Ill. App. 3d at 314, 474 N.E.2d at 31.

Thus, in *James v. James* (1958), 14 Ill. 2d 295, 305-06, 152 N.E.2d 582, 587-88, the supreme court found the trial court improperly refused to set aside a settlement agreement on the grounds of duress where the settlement agreement was hastily contrived several hours before a hearing, the trial court improperly instructed the wife regarding the law, and the wife's attorney told her she would have to settle as the matter had been set for hearing. Similarly, in *In re Marriage of Moran* (1985), 136 Ill. App. 3d 331, 337-39, 483 N.E.2d 580, 584-86, the appellate court found the trial court properly set aside a settlement agreement where the ex-wife had no input in the drafting of the settlement agreement and objected to its terms, her attorney threatened to quit on the eve of trial if she did not settle and had a financial motivation to compel to sign the settlement agreement, and the trial court repeatedly misled her about the law and erroneously told her she would not fare better if she proceeded to trial.

However, in *Steichen* (163 Ill. App. 3d at 1078-79, 517 N.E.2d at 648-49), distinguishing *James* and *Moran*, the appellate court noted the trial court properly declined to set aside a settlement agreement on the basis of the ex-husband's allegations of duress. The court noted the ex-husband was not misled by his counsel or the court, was consulted regarding the settlement and participated in the settlement negotiations. Accordingly, the ex-husband failed to prove duress.

Similarly, in *McCaskey* (167 Ill. App. 3d at 865, 522 N.E.2d at 303), the court rejected the ex-wife's contention the settlement agreement had been procured through duress. The court noted the wife knew what assets the parties had, read the agreement, and understood the agreement. Although the wife was economically dependent upon the husband and in a vulnerable position, she had some assets and income of her own, and had previous experience maintaining her own lifestyle. The court concluded the wife was not bereft of the quality of mind necessary to the making of the agreement, and, accordingly, rejected her contention the agreement was procured through duress.

Likewise, in *Riedy* (130 Ill. App. 3d at 314, 474 N.E.2d at 31), the trial court found the settlement agreement had not been entered into under duress. The court noted the wife's contentions that she had been upset, emotionally distraught and under great pressure fell short of the clear and convincing evidence of duress required to set aside a settlement agreement. Moreover, the court noted, cases in which evidence of coercion was found generally involved hastily contrived agreements occurring only hours before the hearing. The wife in *Riedy*, however, had three attorneys, had participated in depositions, and had discussed settlement terms well in advance of the hearing.

■ Lewis seems to allege he entered into the marital settlement agreement under duress. He contends "the wife agreed to give the husband a divorce, if the husband gave her everything and paid certain debts," "in order to get the divorce [he] had to 'pay up' " and that "either he paid or got no divorce." The record is *absolutely devoid* of evidence which would support these contentions. Neither Lewis nor Susan offered any testimony which would suggest Susan was reluctant to agree to a dissolution of marriage or she threatened to delay the dissolution process unless he "gave her everything and paid certain debts." Lewis seems to allege he was under duress because he was in fear of impregnating Susan. He contends "[h]e desired out of the marriage and feared that his wife would get pregnant before they could get divorced. The parties were arguing over having children which the husband didn't want and the wife had stopped taking birth control pills. *** [A]nd no fair and hones[t] man would accept *** however we are not dealing with a fair and honest man but a vindictive woman."

Lewis attempted to introduce evidence regarding whether Susan had stopped taking birth control pills, but this evidence was not admitted. Moreover, the arguments regarding whether the parties would have children together occurred before Lewis told Susan he wanted a divorce in November and not in December and January when the settlement agreement was negotiated and entered into. Finally, at the time the settlement agreement was negotiated and entered into, the parties were no longer living together as husband and wife. Lewis had moved out of the home and was residing with his girlfriend. Accordingly, we reject any contention he entered into an unfavorable settlement agreement, under duress, because he was under time constraints to finalize the dissolution before he was somehow tricked into impregnating Susan.

Unlike *James* and *Moran*, there is no evidence in this case Lewis was misled by Susan, counsel, or the court. This case bears more

similarity to *Steichen*, *McCaskey* and *Riedy*. Like the husband in *Steichen*, Lewis participated in the settlement negotiations; in fact, the trial court found he *initiated* the settlement negotiation. Although Lewis' testimony was that he took prescription medication to control his depression, like the wives in *Riedy* and *McCaskey* he presented no evidence he was bereft of the quality of mind essential to the making of the agreement. Accordingly, the trial court's determination the settlement agreement was not procured through duress is not against the manifest weight of the evidence.

## B. *Fraud*

Lewis alleges the settlement agreement was procured by fraud because (1) Susan represented she would sell the house immediately and has not done so, and (2) she led him to believe Nardulli was his attorney. Fraud must be established by clear and convincing evidence. Fraud is the intentional misrepresentation of a material fact or the concealment of a fact which induces a party to rely on that misrepresentation to his or her detriment. (*Gurin*, 212 Ill. App. 3d at 813, 571 N.E.2d at 862.) In order to be fraudulent, a misrepresentation must (1) consist of a false statement of material fact, (2) known to be false by the party making it, (3) made for the purpose of inducing the other party to act on reliance on its truth, and (4) in fact relied upon by the other party. *Riedy*, 130 Ill. App. 3d at 315, 474 N.E.2d at 31.

In *Gurin* (212 Ill. App. 3d at 813-14, 571 N.E.2d at 862-63), the court found the settlement agreement had been procured through fraud where the husband failed to disclose all material facts when entering into the settlement agreement. William and Janet Gurin negotiated a settlement agreement and presented it to the court. Both in the settlement negotiations and at the hearing, William represented he was unemployed and received $200-per-week unemployment compensation. (*Gurin*, 212 Ill. App. 3d at 809, 571 N.E.2d at 859.) Based on this representation, Janet agreed to accept child support in the amount of $75 per week, waived maintenance, and gave William the marital residence and most of their vehicles. (*Gurin*, 212 Ill. App. 3d at 813, 571 N.E.2d at 862.) William neglected to mention that he would begin employment within two weeks and would receive income of $620 per week.

Reversing the trial court's denial of Janet's motion to modify under section 2—1301 of the Code (Ill. Rev. Stat. 1987, ch. 110, par. 2—1301), the appellate court found William had an affirmative duty to disclose all information regarding his increase in income and change of employment status to Janet prior to signing and the court's

entry of the judgment. The court found, in light of William's duty to speak, his failure to do so amounted to fraud. *Gurin*, 212 Ill. App. 3d at 815, 571 N.E.2d at 863.

However, in *Riedy*, the appellate court affirmed the trial court's denial of a petition to vacate a judgment of dissolution under section 2—1203 of the Code (Ill. Rev. Stat. 1983, ch. 110, par. 2—1203). Patricia Riedy contended she entered into the marital settlement agreement as the result of fraud on the part of Patrick Riedy. Specifically, Patricia contended, at the time of the hearing, Patrick represented his health insurance was still in effect, which would have allowed her to convert the coverage into an individual policy for herself. Patricia contended Patrick was actually aware his insurance had been cancelled. (*Riedy*, 130 Ill. App. 3d at 315, 474 N.E.2d at 31.) The evidence at the hearing on the petition to vacate was contradictory with respect to whether Patrick's insurance was actually cancelled due to nonpayment of premiums, and, if so, whether Patrick knew of any cancellation. Accordingly, the appellate court determined the trial court properly found the wife failed to prove, by clear and convincing evidence, that the husband fraudulently misrepresented his insurance was still in effect. *Riedy*, 130 Ill. App. 3d at 316-17, 474 N.E.2d at 32.

■ The facts in the present case fall woefully short of establishing fraudulent misrepresentation or concealment, such as that which was present in the *Gurin* case. Lewis contends he was the victim of fraud because Susan represented she would sell the house, although she has no intention of doing so. There is *no* evidence in the record which would support this contention. Rather, the record reflects Susan has diligently attempted to sell the residence. Moreover, the record reflects her attention to the sale of the home has been appropriate. After entering into the agreement with Lewis, Susan promptly arranged for the necessary repairs to the residence and promptly listed the residence with a realtor upon the completion of the repairs. Accordingly, Lewis has not proven Susan's representation she would sell the residence was false.

Lewis' contention that Susan fraudulently led him to believe Nardulli was his attorney must also be rejected as he failed prove such a representation had been made. Susan testified she never told Lewis that Nardulli was representing him. Lewis never met Nardulli, never consulted with him, and never received advice from him regarding the dissolution. The judgment order clearly states Nardulli represented Susan, and Lewis appeared *pro se*. Accordingly, Lewis failed to prove, by clear and convincing evidence, that Susan represented Nardulli to be Lewis' attorney.

## C. *Unconscionability*

Interestingly, Lewis contends (1) the trial court erred because it *failed* to consider his contention the agreement was unconscionable, and (2) in ruling upon his contention the agreement was unconscionable, the trial court erred in determining it was not unconscionable.

■ Lewis initially argues the trial court failed to rule on his contention that the agreement was unconscionable within the meaning of section 502 of the Marriage Act. This argument ignores the explicit ruling of the trial court, which found the agreement was not unconscionable within the meaning of section 502 of the Marriage Act. Specifically, the court, having already discussed the conditions under which the agreement had been negotiated, stated it would examine the financial circumstances at the time of making the agreement. The court found Lewis' later economic reversals could not be considered in determining whether the agreement was unconscionable. Accordingly, the court rejected Lewis' contention the agreement was unconscionable.

Lewis next alleges the trial court erred in determining the agreement is not unconscionable. In determining whether a settlement agreement is unconscionable, the court must consider (1) the conditions under which the agreement was made, and (2) the economic circumstances of the parties which result from the agreement. (*Gurin*, 212 Ill. App. 3d at 816, 571 N.E.2d at 864.) He alleges the agreement is unconscionable because Susan took advantage of his depression and lack of education and sophistication, causing him to enter into an agreement whereby he was "skinned." He contends the agreement is "totally one-sided" and there is "no way [he] can live with it." In support of his position he cites *Carlson*.

In *Carlson*, the court found the wife entered into a settlement agreement under duress. The wife's foster father, a reverend, contacted the husband after learning the wife was having an extramarital affair. During the conversation, the husband revealed he had employed detectives and knew her to be having an extramarital affair. (*Carlson*, 101 Ill. App. 3d at 926-27, 428 N.E.2d at 1008.) At a later meeting attended by the parties, the husband's parents, the wife's father, and the husband's brother, the wife was told that based upon the evidence the husband had against her, he could take the children from her and leave her with nothing. The wife was told she did not deserve the children, was a tramp, and was a lousy mother. The husband threatened to take the children away from her and have them raised in Sweden by his relatives. The husband retained an attorney, introduced the wife to the attorney, and represented to the attorney that the parties wished to dissolve their marriage and

had reached an agreement. The husband explained the terms of the agreement to the attorney. During this meeting, the wife was given numerous documents to sign, which included a quitclaim deed transferring her interest in the house to the husband, and the marital settlement agreement. The agreement provided the husband would receive the marital home, the car, and custody of the children. The wife received household items and $55 per week for 16 weeks.

Examining the circumstances under which the agreement was made, this record is devoid of any circumstances akin to those present in *Carlson*. Lewis was not coerced or threatened. A single attorney did not represent both parties. Finally, Lewis did not merely acquiesce to the terms of the settlement, but initiated and actively participated in the negotiations.

Moreover, the economic circumstances resulting from the property settlement do not require a finding of unconscionability. Lewis has submitted an exhibit which purports to set forth the distribution of assets of the parties. According to this exhibit, Susan received net assets of $208,000, while Lewis received net liabilities of $41,450. In arriving at these numbers Lewis has inflated the value of the assets distributed to Susan, failed to include the debts allocated to her, inflated the liabilities allocated to him, and failed to include the value of the assets allocated to Lewis. Due to Lewis' misrepresentations and omissions, we are unable to ascertain the actual value of the assets and liabilities allocated to the parties. Although the agreement may favor Susan, that an agreement merely favors one party over another does not make it unconscionable. (*Riedy*, 130 Ill. App. 3d at 318, 474 N.E.2d at 33.) Moreover, since Susan contributed between $60,000 and $70,000 in nonmarital assets to the acquisition of the marital property and, at the time of the entry of judgment, Lewis earned more than Susan, the agreement allocating more of the marital assets to her is not unconscionable.

### D. *Other Grounds*

Lewis next contends the trial court "should have been looking for other grounds to vacate the decree" including mutual mistake, "good defense" or new evidence. Although the existence of a mutual mistake or newly discovered evidence might support the granting of a section 2—1401 motion, they do not support the granting of this section 2—1401 motion. Lewis neither alleged nor proved the existence of mutual mistake or newly discovered evidence. The trial court, in ruling upon a section 2—1401 motion, has no obligation to "look for" grounds not raised by the petitioner, upon which to set aside a judgment.

## III. CONCLUSION

There is no evidence in the record which would support the granting of Lewis' section 2—1401 petition. The trial court did not abuse its discretion in denying the petition.

Affirmed.

LUND and GREEN, JJ., concur.