# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

*In re Marriage of Kranzler*, 2018 IL App (1st) 171169

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ULIANA KRANZLER, Petitioner-Appellant, and LEONARD KRANZLER, Respondent-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-1169 |
| Filed | September 27, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-D-9295; the Hon. John Thomas Carr, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Grund & Leavitt, P.C., of Chicago (Marvin J. Leavitt, David C. Adams, and Ilene E. Shapiro, of counsel), for appellant.<br><br>Davis Friedman, LLP, of Chicago (Míle Knabe, Errol Zavett, and David M. Goldman, of counsel), for appellee. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice McBride and Justice Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Petitioner Uliana Kranzler appeals the circuit court's orders granting respondent Leonard Kranzler's motion for declaratory judgment and denying her motion to dismiss. We affirm, based on our conclusions that the circuit court had subject-matter jurisdiction over the dispute and the parties' premarital agreement was valid and enforceable.

¶ 2                                I. BACKGROUND

¶ 3    On October 9, 1984, Uliana and Leonard married on the same day they executed the premarital agreement. At the time, Leonard was 47 years old and Uliana was 29 years old and approximately five months pregnant with the couple's first child. The parties ultimately had three children, all of whom were emancipated adults at the time Uliana filed her petition for dissolution in 2015.

¶ 4    The agreement provides, *inter alia*, that (1) any property acquired before marriage would remain in their individual names upon termination of the marriage and each party waived any interest in or claim to the other's property or income; (2) any property acquired jointly during the marriage would be divided equally upon termination of the marriage or death; (3) provided they were married at the time of death, Leonard would leave to Uliana a certain percentage of his net estate, which increased the longer they were married (40% if the parties were married more than 180 months); and (4) if either party filed for dissolution or separation, Leonard agreed to pay to Uliana, in lieu of maintenance, a set monthly amount for a certain number of months, both of which increased the longer they were married. As the parties were married for more than 240 months, Uliana was entitled to receive $2500 per month for 100 months. Attached to the agreement was a document disclosing Leonard's financial condition and assets, which were approximately $6.9 million in 1984.

¶ 5    On October 8, 2015, Uliana filed a petition for dissolution of marriage (case No. 15-D-9295). Leonard filed an answer on November 19, 2015, raising no counterclaims.

¶ 6    On December 10, 2015, Leonard filed a motion for a declaratory judgment under section 2-701 of the Code of Civil Procedure (Code) (735 ILCS 5/2-701 (West 2014)) requesting that the circuit court find the premarital agreement valid and enforceable.

¶ 7    Uliana filed a response and an amended response on July 14, 2016, to Leonard's motion for declaratory relief. She also filed a countermotion for declaratory judgment regarding the agreement. Uliana argued that the agreement was invalid on grounds that it was unfair and unreasonable; created an unforeseeable condition of penury, was void due to duress, lack of knowledge, and undue influence; was unconscionable; and was based on an illusory promise.

¶ 8    On November 14, 2016, Uliana filed a motion for voluntary dismissal of her dissolution action. On November 15, 2016, Leonard filed a counterpetition for dissolution of marriage and a motion for leave to file the counterpetition. On November 16, 2016, Leonard filed a response to Uliana's motion for voluntary dismissal of her petition, asserting that his motion for declaratory relief could stand as an independent cause of action surviving the dismissal.

¶ 9    On November 17, 2016, the circuit court granted Uliana's motion for voluntary dismissal of her petition for dissolution, but found that, based on *In re Marriage of Best*, 228 Ill. 2d 107 (2008), and *In re Marriage of Krol*, 2015 IL App (1st) 140976, Leonard's motion for declaratory judgment constituted an independent action surviving dismissal of her petition. On

November 18, 2016, the court denied Leonard's motion for leave to file a counterpetition for dissolution of marriage.

¶ 10    On November 18, 2016, Leonard initiated a separate dissolution action by filing his own petition for dissolution of marriage, which proceeded before the same judge (case No. 16-D-10698). He filed a motion to consolidate the two cases but later withdrew it. Uliana filed an answer and counterclaim, asserting, *inter alia*, the same arguments she had raised against the agreement in response to Leonard's motion for declaratory relief. Leonard moved to dismiss Uliana's counterclaims in his dissolution case.

¶ 11    On November 29, 2016, Uliana filed a motion to dismiss Leonard's motion for declaratory judgment in the present case on the basis of (1) lack of subject-matter jurisdiction and (2) failure to satisfy the termination-of-controversy required for declaratory relief.

¶ 12    The circuit court denied Uliana's motion to dismiss Leonard's motion for declaratory judgment on January 3, 2017, citing the same reasons it relied on in allowing Leonard's motion for a declaratory judgment to survive the dismissal of Uliana's petition for dissolution. The court also denied Uliana's request for a finding that there was no just reason for delaying appeal pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). In addition, the circuit court entered an order in Leonard's dissolution case (case No. 16-D-10698), granting Leonard's motion to dismiss most of Uliana's counterclaims.

¶ 13    A trial on Leonard's motion for declaratory relief (in case No. 15-D-9295) occurred over two days. Leonard testified that he and Uliana began dating in August 1983 but continued to date other people. Within a few months of meeting, Uliana moved into his apartment. At some point, Uliana became pregnant; she had an abortion after they discussed it. Approximately one year later, Uliana again became pregnant. Uliana told Leonard that she did not want to have another abortion. Leonard responded that he understood, but he did not want to get married. Leonard testified that neither he nor Uliana wanted to get married.

¶ 14    Leonard testified that when his father and Uliana's father learned of the second pregnancy, they spoke to each other and then to Leonard about marrying Uliana. "[T]he discussion was get married, have an antenuptial agreement that allows you to have a short marriage if that is what you wish, this covers all the bases, the baby will not be born improperly, you will go on with your lives without great cost emotionally and socially." Leonard testified that the two fathers reasoned that the marriage could be short and "[t]he prenup will protect you from serious financial consequences. If you choose to stay married longer, you can do so. *** And that seemed like a reasonable compromise so that since there will be no abortion, the baby will have a name and be a legitimate baby not born out of wedlock."

¶ 15    Leonard testified that he was persuaded to get married because having a baby out of wedlock would "affect the child, it would affect my professional standing, reputation, and Uli[ana]'s reputation." Leonard testified that he was concerned with the embarrassment it would bring to him and his family. He also decided to get married out of respect for his father, although his father would not have disowned or disinherited him. Leonard testified that Uliana's father was similarly eager for her to marry because of the concern of bringing shame to her and her family. Leonard testified that "to a large extent" both he and Uliana were forced to get married.

¶ 16    Leonard believed his father, who was an attorney, contacted a law firm to draft the agreement. Leonard believed Uliana's lawyer was sent a draft of the agreement on September

- 3 -

27, 1984. Leonard testified that "various versions of the prenup were presented back and forth" and there were negotiations and revisions by Uliana and her lawyer.

¶ 17 With regard to the execution of the agreement, Leonard testified that "[t]he understanding was that if she would sign the agreement, I would sign the agreement. And apparently some many days or weeks went by where she was not signing, I was not signing." On the evening of October 9, 1984, his father called him and informed him that Uliana had agreed to sign the agreement. Leonard "said, well, I had agreed to sign it if she did also. So I left what I was doing and went to the apartment, and the rest followed."

¶ 18 When he arrived at his apartment, his father, Uliana's father, Uliana, a rabbi, and a mutual friend were already there. He believed Uliana signed the document around 7, 8, or 9 p.m. that evening. Leonard testified that they did not discuss anything but sat down at the dining room table and signed the agreement. Uliana initialed each page and signed it. He did not force her to sign it. Uliana was five months pregnant at the time. She was experiencing a difficult pregnancy as "she was nauseated, retching, and she had to eat continuously," but he did not notice these symptoms that evening. Leonard described Uliana's demeanor at the time as "normal" and "composed"; she did not appear to be upset. A list of Leonard's assets, liabilities, and income was attached to the agreement. Leonard made one alteration when he signed the agreement, which was to extend the time period Uliana would receive alimony from 24 months to 36 months if they were married for less than 24 months. The wedding ceremony occurred immediately afterwards on the balcony of their apartment.

¶ 19 Leonard testified that he and Uliana lived together for a year or a year and a half before they married. They did not have a formal financial arrangement; she asked him for money whenever she needed it. They lived in a 3500 square foot apartment on Lake Shore Drive which cost approximately $3500 per month. Leonard was a physician at the time and he obtained a law degree during the marriage. Uliana worked in a real estate office as either the office manager or a "high-level secretary." She stopped working shortly after they married.

¶ 20 Leonard conceded that after Uliana filed the petition for dissolution, he created an estate plan that was not in conformance with the agreement. He subsequently modified it to conform to the agreement.[1] She also had a life insurance policy for him.

¶ 21 Uliana testified that she is originally from Europe and came to the United States in 1972. She attended the University of Illinois at Chicago Circle, graduating in 1979 with a degree in communications, speech, and theater, and a minor in Biology. She worked throughout high school and college and paid for her education. She has previously worked as a babysitter, instructor at a health club, manager of a health club, and in a real estate office. Uliana survived cervical cancer when she was 24 years old.

¶ 22 She testified that she became pregnant in 1982. When her mother, who was a "Ph.D. nurse," realized Uliana was pregnant, her mother disowned her, so she moved in with Leonard. She got an abortion. At the time, she was 26 years old and Leonard was 44 years old.

¶ 23 Uliana became pregnant again in 1984. Uliana testified that she and Leonard did not really discuss marriage. Uliana testified Leonard "was not unhappy or happy. But he didn't promote

---

[1]On October 21, 2016, Uliana filed a motion for mandatory temporary injunctive relief, arguing that the agreement provided that Leonard shall leave 40% of his net estate to Uliana if they were married at the time of his death and had been married for more than 20 years. Uliana asserted that Leonard executed a will in which he left her only one-eighth of his estate.

the marriage. And I stated to him I will not have another abortion. I would have a child, and I don't need to be married. I will not—I am not looking for marriage, but I will not kill another baby." She testified that she did not want to get married because she felt that Leonard wanted her to have another abortion; he did not push marriage but instead avoided the situation and her by coming home late from work.

¶ 24 Uliana testified that she could not support herself at the time. She was "running the front desk" of a real estate office and earned "a couple hundred dollars" per week. She was also making payments on her own car. She worked full time until January 1985, approximately one and a half months before she gave birth. She testified that she experienced a "toxic pregnancy"; she was "throwing up day and night," ate bread or bagels constantly, and had to take a two-hour lunch at work in order to take a nap due to fatigue. She experienced edema in her feet and became "tremendously overweight."

¶ 25 Uliana did not tell her father about the pregnancy until she was over four months along because she knew she would "break his heart" since he was "old fashioned." Her father asked about marriage, but she informed him that she and Leonard did not want to get married. Her father refused to speak to her for one month after that. Her father stated that he would "disown me to have a bastard of a child." Uliana testified that Leonard's father spoke with her father and they then told Uliana "you need to get married because you don't want to have a bastard for a child." They called her every day. She testified that she trusted Leonard's father "[f]or his advice and for his tremendous care of me, calling me, asking me how I feel *** on a daily basis."

¶ 26 Uliana testified that when she was four and a half months pregnant, Leonard presented her with "a prenup" and told her "the only way we could get married is if you sign this prenup." Uliana testified that Leonard gave her the draft agreement in September and stated "this is a prenup. If you want to sign this, I guess we will get married."

¶ 27 She read the agreement, but could not understand it. She called Leonard's father because he was "[a] lawyer and I trusted him *** to guide me on the prenup, to say—I didn't understand. I have never heard of prenups." He told Uliana to look for an attorney. Through a colleague, she found a lawyer to examine it. She met with him once to review the agreement.

¶ 28 Approximately one week after Leonard presented her with the agreement, Uliana informed him that she did not want to sign it. She testified that Leonard "didn't say anything. I said I am not signing it and I am not going through this. I don't need to marry you. I am going to have a child. I am happy to have a child and to raise a child."

¶ 29 Uliana testified that she did not want to marry Leonard. However, she ultimately married him anyway because "[b]eing called daily and being told by two separate people that were fathers, his father, my father saying you can't have a child that is a bastard. You cannot do that. Think of your child. The child needs a name. And, of course, I was sicker and sicker, gaining more weight. Had edema, swelling feet, couldn't walk." She was hospitalized three or four times for dehydration during her pregnancy.

¶ 30 Uliana testified that on October 9, 1984, she came home from work at 6 p.m. and Leonard arrived at 9 p.m. and told her "we get married tonight or never" and "here is the prenup. And if you don't sign it, we will not get married anymore. That's it. This is the last chance." Leonard informed her that his parents were coming over for the Jewish holiday, Sukkot, and "[w]e get married today or never, and you got to sign this. Without this, we don't get married." Uliana testified that it took her 20 to 30 minutes to sign it. None of her friends or family were present;

her father was at work and her brother lived in Wisconsin. She initialed every page but did not read it. She did not make any changes to it. She then signed the ketubah and the ceremony was held "[a] few minutes before midnight." Leonard's father and mother, Leonard's sister and her husband, the rabbi, and their mutual friend and his wife were present. Uliana testified that she was five months pregnant at the time; she felt fatigued and tired and "couldn't even keep my head up." She testified that she threw up in the bathroom a few times and then went out onto the balcony, where the ceremony occurred. She testified that she leaned against a post during the ceremony because her feet were so swollen.

¶ 31    Uliana testified that she had last seen the agreement in September when she reviewed it with her lawyer, but she did not understand what she would receive in the event of divorce or what she was giving up. She had a copy of it at home. She testified that she was not aware of the value of Leonard's estate before she married him, although she was presented with the exhibit attached to the agreement when she met with her lawyer.

¶ 32    She testified that Leonard supported her financially during the marriage and she did not have other assets. He gives her a $1000 a month "allowance" for food and clothing and covers her travel expenses separately. She owns a house in Michigan jointly with her three children that she estimates is worth $200,000. She also owns five cemetery plots. Uliana testified that she currently manages four residential real estate rental properties that Leonard owns. She lives in the couple's 5500 square foot home. The property they lived in before that was also a 5500 square foot custom-built home. They also have a 3600 square foot penthouse in Florida. She drove Lexus vehicles for most of their marriage. They vacationed in Florida every year, traveled internationally, and attended the opera, symphony, and theater.

¶ 33    She testified that $2500 per month would not cover her current medical bills. Regarding her current health status and medical expenses, Uliana testified that she had abnormal tissue removed from her breast in 2009 and suffered an infection when her implant was removed. She is also diabetic and suffers from high blood pressure, depression, and severe osteoporosis, which requires a $1600 shot twice a year to treat. She suffers from complications as a result of bariatric surgery in 2006. She needs a hip replacement but cannot afford it. She is in chronic pain and is qualified to receive a morphine pump.

¶ 34    On May 1, 2017, the circuit court entered an order in which it found that the agreement was valid and enforceable and granted Leonard's motion for declaratory relief. The circuit court's order provided:

> "A. When petitioner and respondent signed the Antenuptial Agreement it was fair and reasonable.
>
> B. Uliana Kranzler did not establish by clear and convincing evidence that the Antenuptial Agreement was the product of fraud, duress, or coercion.
>
> C. Neither party particularly wanted to get married.
>
> D. Uliana Kranzler although she did not read the Antenuptial Agreement on the day she signed it, she was represented by counsel and had the opportunity to be advised on the Antenuptial Agreement and the time to read and understand the agreement.
>
> E. The parties may have contemplated a short marriage and the court observes that the Premarital Agreement Act, enacted after the parties' marriage, the court believes redefines penury differently than prior case law.

F. If there was any coercion on the parties, who *** married for religious/ cultural reasons, it came from their parents, but that does not amount to the coercion or duress contemplated by the case law.

G. The court finds that the award of scheduled payments are sufficient in the circumstances may have been on the low side of fair and reasonable but even so especially when coupled with the award of a portion of Leonard Kranzler's estate, given the age differences between the parties, that the Antenuptial Agreement is fair and reasonable.

H. Uliana Kranzler entered into the Antenuptial Agreement voluntarily.

I. The Antenuptial Agreement in the event of Leonard's death did not differentiate between his separate estate and his entire estate."

¶ 35    The trial court included a Rule 304(a) finding. Uliana filed a timely notice of appeal from the May 1, 2017, order.

¶ 36                                    II. ANALYSIS
¶ 37                                  A. Standard of Review
¶ 38    A motion to dismiss brought pursuant to section 2-619(a)(1) of the Code (735 ILCS 5/2-619(a)(1) (West 2014)) permits involuntary dismissal of an action based on lack of subject-matter jurisdiction. We review *de novo* the trial court's decision to grant or deny a motion under this section. *R.L. Vollintine Construction, Inc. v. Illinois Capital Development Board*, 2014 IL App (4th) 130824, ¶ 23. In doing so, we must interpret the pleadings and any supporting documents in the light most favorable to the nonmoving party. *Id.*

¶ 39    The appropriate standard of review to be applied to declaratory judgments depends on the underlying questions at issue and "the nature of the proceedings in the trial court." *Pekin Insurance Co. v. Hallmark Homes, L.L.C.*, 392 Ill. App. 3d 589, 593 (2009). "A premarital agreement is a contract ***." *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 40. The interpretation of a contract and whether a valid contract exists are determinations reviewed *de novo*, to the extent the facts are undisputed. *Id.*; *In re Marriage of Rife*, 376 Ill. App. 3d 1050, 1054 (2007). We review factual issues under the manifest weight standard, that is, we reverse only if an opposite conclusion is clearly apparent. *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 48.

¶ 40            B. Uliana's Motion to Dismiss Leonard's Motion for Declaratory Judgment
¶ 41    On appeal, Uliana first contends that the circuit court erred in denying her motion to dismiss Leonard's motion for declaratory judgment because the court lacked subject-matter jurisdiction over Leonard's motion after she voluntarily dismissed her petition for dissolution.

¶ 42    Leonard responds that his request for declaratory relief was based on distinct statutory grounds from Uliana's petition for dissolution of marriage and constituted an independent controversy which could stand on its own.

¶ 43    Circuit courts of our State possess original jurisdiction over all justiciable matters brought before it. Ill. Const. 1970, art. VI, § 9; *In re Luis R.*, 239 Ill. 2d 295, 301 (2010). "This court defines subject-matter jurisdiction as a court's power to hear and determine cases of the general class to which the proceeding in question belongs." (Internal quotation marks omitted.) *Luis R.*, 239 Ill. 2d at 300. To invoke the circuit court's subject-matter jurisdiction, the

complaint or petition must allege the existence of justiciable matter. *Id.* at 300-01. "Generally speaking, a 'justiciable matter' is 'a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests.' " *Id.* at 301 (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 335 (2002)). "In other words, the only consideration is whether the alleged claim falls within the general class of cases that the court has the inherent power to hear and determine." (Emphasis omitted.) *Id.*

¶ 44 The parties do not dispute that the circuit court had subject-matter jurisdiction over Uliana's petition for dissolution of marriage, which she brought under the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2014)). Such jurisdiction is statutorily conferred. *In re Marriage of Milliken*, 199 Ill. App. 3d 813, 817 (1990) ("The jurisdiction of a court in a dissolution proceeding is limited to that conferred by statute.").

¶ 45 Leonard filed his motion for declaratory relief under section 2-701 of the Code. Subsection (a) of this statute provides that a court

> "may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any *** contract or other written instrument, and a declaration of the rights of the parties interested. *** The court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2-701(a) (West 2014).

¶ 46 Under subsection 2-701(b), a "[d]eclarations of rights, as herein provided for, may be obtained by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well." *Id.* § 2-701(b).

¶ 47 Uliana argues that the validity of the agreement was merely an ancillary issue to her petition for dissolution and the jurisdictional basis to decide it did not survive the voluntary dismissal of her petition. She relies on *In re Marriage of Leopando*, 96 Ill. 2d 114, 119-20 (1983), where our supreme court held that a dissolution proceeding constituted only a single claim, and therefore, rulings on other issues raised within that proceeding, such as custody matters, were merely ancillary issues and not separate claims individually appealable under Rule 304(a).

¶ 48 More recently, however, our supreme court in *Best*, 228 Ill. 2d at 119, found that an appellate court may consider a declaratory judgment motion concerning the validity and effect of a premarital agreement before a final dissolution order has been entered, as long as the requirements under section 2-701 have been met. In *Best*, the husband petitioned for dissolution of the marriage and later filed a motion, as part of the dissolution case and not as a separate action or case, for a declaratory judgment regarding the validity and construction of the parties' premarital agreement. *Id.* at 109-112. The trial court found the premarital agreement valid and enforceable and included Rule 304(a) language in its order; the husband appealed the order while the dissolution proceeding remained pending. *Id.* The *Best* court distinguished *Leopando*, observing that only the Marriage Act was at issue in *Leopando*, whereas the petitioner in *Best* sought not only nondeclaratory relief (dissolution of marriage) under the Marriage Act but also declaratory relief under section 2-701 and the Illinois Uniform

Premarital Agreement Act (750 ILCS 10/1 *et seq.* (West 2004)) (to address the validity and construction of the premarital agreement). *Best*, 228 Ill. 2d at 114-15. Unlike *Leopando*, "the two requests for relief here had distinctly different statutory bases." *Id.* at 115. In further distinction, assuming the request for declaratory relief met the statutory requirements, a declaratory judgment could be entered even if the dissolution petition was not granted. *Id.* Additionally, the declaratory judgment in *Best* did not make actual awards in the pending dissolution matter, unlike in *Leopando*. *Id.* As such, the court held the petitioner's two actions in the dissolution proceeding were "not so closely related that they must be deemed part of a single claim for relief, as they were in *Leopando*." *Id.*

¶ 49 The petitioner in *Best* also argued that the termination-of-controversy requirement in section 2-701(a) was met despite the fact that ruling on the declaratory judgment motion would not resolve the dissolution petition or any claims for fees or support. Our supreme court held that because the Marriage Act incorporates the Civil Practice Law (735 ILCS 5/2-101 *et seq.* (West 2004)), "the legislature expressly provided for the entry of declaratory judgments in dissolution cases." *Best*, 228 Ill. 2d at 116. "[A] reviewing court may consider the validity and effect of a declaratory judgment order in a dissolution proceeding, even if it is entered before the final dissolution order, if the prerequisites of the declaratory judgment statute are met." *Id.* at 119. Thus, the court concluded that under section 2-701(a), "a declaratory judgment of the parties' rights under the premarital agreement is proper if: (1) there is an actual controversy; and (2) entry of a declaratory judgment would terminate 'some part' of that controversy (735 ILCS 5/2-701(a) (West 2004))." *Best*, 228 Ill. 2d at 116-17. It was undisputed that an actual controversy existed in *Best*. The court found that the second statutory criterion was also met because a declaratory judgment would end "some part" of the controversy, *i.e.*, a ruling on the validity and application of the premarital agreement would determine various rights of the parties in the dissolution proceeding and "terminate a significant part" of the controversy. *Id.* at 117.

¶ 50 We also find *Krol*, 2015 IL App (1st) 140976, ¶ 22, helpful in analyzing whether Leonard's motion could stand on its own. In *Krol*, the father filed a petition for dissolution in Polish court and the mother subsequently filed a petition for dissolution and custody in the circuit court of Cook County. The father then filed a petition in the Cook County case under the Convention on the Civil Aspects of International Child Abduction (Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89), requesting a decision on the habitual residence of the child. After the mother voluntarily dismissed her petition, this court held that the father's "Hague petition should be treated as an independent action that survives the dismissal of the petition for dissolution of marriage" given its independent statutory grounds and the "Hague petition could have initiated a cause of action" on its own. *Id.*

¶ 51 Along similar lines, the court in *Rife*, 376 Ill. App. 3d at 1061-62, held that a petition for declaratory relief "raised an independent controversy" that satisfied the requirements of section 2-701(a), despite being filed after a dissolution judgment was entered. The respondent filed several petitions to modify the dissolution judgment, the petitioner filed responses, and the respondent then filed a petition for declaratory relief, claiming that the petitioner's response constituted a counterpetition and triggered a modification clause in the dissolution judgment. *Id.* at 1052-53. The petitioner asserted that the declaratory action would not terminate some or all of the controversy. *Id.* at 1061. The appellate court found the declaratory

- 9 -

action "raised an independent controversy, one that did not depend on the resolution of any other that was pending." *Id.* at 1062.

¶ 52    Uliana argues that Leonard's motion for declaratory relief cannot stand on its own because there was no "actual controversy" remaining after she voluntarily dismissed her petition and (2) the motion for declaratory relief should have been dismissed because it failed to satisfy the "termination of controversy" requirement under section 2-701(a). She argues that upon voluntary dismissal of her petition, she essentially no longer disputed the enforceability of the agreement and Leonard's motion became moot.

¶ 53    We find that both of the requirements for declaratory relief outlined in *Best* are satisfied in the present case. See *Best*, 228 Ill. 2d at 117. Our supreme court has explained that an "actual controversy" under section 2-701

> "does not mean that a wrong must have been committed and injury inflicted. Rather, it requires a showing that the underlying facts and issues of the case are not moot or premature, so as to require the court to pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events." *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375 (1977).

The underlying purpose of section 2-701 is "to allow the court to address a controversy one step sooner than normal, after a dispute has arisen but prior to any action which gives rise to a claim for damages or other relief." *Delano Law Offices, P.C. v. Choi*, 154 Ill. App. 3d 172, 173 (1987). As such, an actual controversy requires "a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof." *Underground Contractors*, 66 Ill. 2d at 375.

¶ 54    In the present case, at the time the circuit court considered Uliana's motion for voluntary dismissal of her petition for dissolution, an active controversy regarding the agreement remained. There were several matters pending before the court, *e.g.*, Leonard's motion for declaratory relief concerning the agreement, Uliana's countermotion for declaratory relief to find the agreement invalid, and Leonard's motion for leave to file a counterpetition for dissolution of marriage. Uliana had also filed a motion for injunctive relief claiming that Leonard violated the agreement in executing a will after she filed for divorce in which he left her one-eighth, instead of 40%, of his estate. Additionally, at the time the trial court considered and denied Uliana's subsequent motion to dismiss Leonard's declaratory judgment action, Leonard had already initiated a separate dissolution action by filing his own petition for dissolution, which remained pending. Notably, Uliana raised as counterclaims in Leonard's dissolution case the same arguments she raises against the declaratory judgment action in the present case. Thus, it is clear from the record that an actual controversy existed regarding the validity and enforceability of the agreement at the time the circuit court made the pertinent rulings. The validity and enforceability of the agreement was not merely an ancillary issue like in *Leopando*. Rather, it formed a separate claim for relief based on separate statutory grounds, similar to *Best*, *Krol*, and *Rife*.

¶ 55    Additionally, we find the trial court's ruling on Leonard's motion for declaratory judgment would terminate "some part" of the parties' controversy. *Best*, 228 Ill. 2d at 117. As the supreme court observed in *Best*, 228 Ill. 2d at 117, such a ruling would determine whether the premarital agreement controls "various facets of the parties' rights in the pending dissolution proceeding."

- 10 -

¶ 56        Uliana also contends that the court lacked subject-matter jurisdiction because Leonard did not file his motion as a separate pleading or counterclaim or pay a fee for filing a counterlcaim. However, in *Best*, the petitioner filed a motion for declaratory judgment as part of the dissolution case and not as a separate pleading or counterclaim. *Id.* at 110. Thus, the fact that Leonard's declaratory judgment request was not titled "counterclaim" did not deprive the circuit court of subject-matter jurisdiction. Moreover, "the caption of a motion is not controlling; the character of the pleading is determined from its content, not its label." *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 102 (2002) (citing *Barnes v. Southern Ry. Co.*, 116 Ill. 2d 236 (1987)).

¶ 57        Accordingly, we find that the court had subject-matter jurisdiction to consider Leonard's motion for declaratory judgment.[2]

¶ 58                        C. Validity of the Antenuptial Agreement

¶ 59        We now turn to Uliana's challenge to the trial court's decision to grant Leonard's motion for declaratory judgment and determination that the agreement was valid and enforceable.

¶ 60                        i. Illinois Uniform Premarital Agreement Act

¶ 61        Uliana argues that the circuit court erred as a matter of law because it applied the Illinois Uniform Premarital Agreement Act (Premarital Agreement Act) (750 ILCS 10/1 *et seq.* (West 2014)). Uliana points to the trial court's statement in its written order that "the parties may have contemplated a short marriage and the court observes that the Premarital Agreement Act enacted after the parties' marriage the court believes redefines penury differently than prior case law."

¶ 62        It is undisputed that the Premarital Agreement Act does not apply to the agreement here, which the parties executed on October 9, 1984. See *Heinrich*, 2014 IL App (2d) 121333, ¶ 49 (the Premarital Agreement Act applies to "any prenuptial agreement executed on or after January 1, 1990"). A closer examination of the circuit court's written order demonstrates that it understood it was applying common law and not the Premarital Agreement Act. The trial court's reference to the Premarital Agreement Act was merely a general observation, as it noted that the Premarital Agreement Act was enacted after the parties entered into the agreement. The circuit court made findings specific to pre-Premarital Agreement Act decisional law.

¶ 63        Prior to the enactment of the Premarital Agreement Act, Illinois common law provided that a premarital agreement that governed property and maintenance rights was

---

[2]In ruling, we note that, at several points in his response brief, Leonard requests this court take notice of matters outside the record and refers to documents that were not part of the instant proceeding in the circuit court. We previously denied his motion to supplement the record. While we decline Uliana's request to strike his brief *en toto*, we disregard any improper argument or reference to facts not supported by the available lower court record. "[A] party may not rely on matters outside the record to support its position on appeal ***." *In re Marriage of Reidy*, 2018 IL App (1st) 170054, ¶ 20. See *In re Marriage of Iqbal*, 2014 IL App (2d) 131306, ¶ 14 (striking a brief for failure to comply with Illinois Supreme Court Rule 341 (eff. Mar. 16, 2007) is "a harsh sanction" appropriate "only when the procedural violations interfere with our review").

"valid and enforceable as long as three conditions are met: (1) the agreement does not create an unforeseen condition of penury due to one spouse's lack of property or employability; (2) the parties entered into the agreement with full knowledge, free of fraud, duress, or coercion; and (3) the agreement is fair and reasonable." *Berger v. Berger*, 357 Ill. App. 3d 651, 656 (2005).

¶ 64   Here, the circuit court held that the agreement was fair and reasonable; was not the product of fraud, duress, or coercion; that Uliana had the opportunity to read and understand the agreement and consult with counsel; and that Uliana entered into the agreement voluntarily. At the hearing on Leonard's motion, the court observed that "penury is not in the present statute" and stated that it was holding "as a matter of law" penury did not exist at the time the agreement was executed in 1984.

¶ 65   In contrast, under the Premarital Agreement Act, a premarital agreement is unenforceable if the party challenging it proves that

"(1) he or she did not execute the agreement voluntarily; or (2) the agreement was unconscionable when it was executed and, before execution of the agreement, the party was not provided a fair and reasonable disclosure of the other's property, did not waive the right to such disclosure in writing, and did not have (and could not reasonably have had) an adequate knowledge of the other's property." *Heinrich*, 2014 IL App (2d) 121333, ¶ 49 (citing 750 ILCS 10/7(a) (West 2012)).

Here, the circuit court made no findings regarding whether the agreement was unconscionable or whether there was full financial disclosure.

¶ 66   Accordingly, we find that the trial court applied the correct law in assessing the validity of the agreement. Regardless, "[a] court of review may affirm a trial court's judgment upon any ground appearing in the record, regardless of whether it was relied upon by the trial court and regardless of whether the reasoning of the trial court was correct." *In re Marriage of Lehr*, 317 Ill. App. 3d 853, 862 (2000); see also *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 300 (2005).

¶ 67                                          ii. Penury

¶ 68   Uliana contends that, contrary to the circuit court's ruling, the agreement should be invalidated as it created an unforeseen condition of penury given her poor health, medical costs, and her lack of employability due to her age, health, and the fact that she stopped working shortly after getting married. *Berger*, 357 Ill. App. 3d at 656.

¶ 69   Here, the court found that at the time the parties signed the agreement, it did not create an unforeseen condition of penury and was fair and reasonable given the parties' age difference, the maintenance provision and the estate provision, and the fact that they may have contemplated a short marriage.

¶ 70   In comparison, in *Warren v. Warren*, 169 Ill. App. 3d 226, 228 (1988), the premarital agreement gave the wife no rights to marital property, maintenance, or attorney fees upon dissolution of marriage. The wife worked as a secretary before marriage and had a net worth of $70,000, while her oil executive husband had a net worth of $7 million. The parties lived together for three years before getting married, and she quit her job at the husband's request. *Id.* at 228. Although the court ultimately found the total waiver of maintenance provision unenforceable on other grounds, the court concluded that the wife would not be reduced to an

unforeseen condition of penury because, although her assets were modest in comparison, they were sufficient, and the fact that she voluntarily quit her employment one year before the marriage made her lack of future employability foreseeable. *Id.* at 230-31.

¶ 71　　Similarly, in *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 522-23 (2001), the appellate court upheld the parties' premarital agreement in which the wife waived all maintenance other than a stipulated amount tied to the length of the marriage ($10,000 after seven years of marriage). The court found that the agreement "reflected the gross disparity in the parties' assets and income at the time of marriage." *Id.* at 523. Although the wife enjoyed a lifestyle beyond what she could have afforded on her own and was earning a salary of only $24,000 at the time of trial, there was no undue hardship or unforeseen circumstances considering she knew the husband's income far exceeded her own at the time she entered into the agreement and the fact that it was the husband's fifth marriage. *Id.* at 523-24.

¶ 72　　Based on *Warren* and *Barnes*, we find no error in the circuit court's decision here. Unlike in *Warren*, where the agreement provided for absolutely no financial settlement upon divorce, Uliana was entitled to receive a monthly payment in maintenance which increased in amount and number of months in proportion to the length of the parties' marriage. As the parties were married for over 30 years at the time the petition was filed, Uliana was to receive $2500 per month for 100 months. The agreement further provides Uliana with all property in her name, such as the house in Michigan worth $200,000, in addition to half of all marital property. The agreement further required Leonard to leave Uliana 40% of his net estate upon death.

¶ 73　　In addition, Uliana was familiar of Leonard's income and wealth before signing the agreement. Uliana lived with Leonard for approximately one or two years before the parties married. They lived in a 3500 square foot apartment which costs $3500 per month, and he would give her money as needed and he was supporting her financially before they married. Thus, similar to the situation in *Barnes*, the agreement reflected the parties' disparity of income and assets before the marriage. It was foreseeable that a withdrawal of this support in the future would affect her standard of living. At the time the parties signed the agreement, Uliana was working full time in a real estate office, paying for her own vehicle, and earning "a couple hundred dollars" per week. Given that she quit her job shortly after the parties signed the agreement and married, her claimed lack of employability was foreseeable. We note that Uliana testified that she currently manages four residential real estate rental properties for Leonard. She has previously worked at other positions of responsibility, including managing a health club, she possesses a college education, and she is fluent in several languages.

¶ 74　　The court found that at the time the parties signed the agreement, it did not create an unforeseen condition of penury and was fair and reasonable given the parties' age difference, the maintenance provision and the estate provision, and the fact that they may have contemplated a short marriage. We cannot say that the court's factual determinations in that regard were manifestly erroneous. See *Certain Underwriters at Lloyd's, London*, 2014 IL App (1st) 132020, ¶ 50. Considering that the maintenance and property waiver provisions are more generous here than in *Warren*, we find no error in the trial court's determination that, at the time of signing, the agreement would not give rise to an unforeseen condition of penury.

¶ 75　　In asserting that the trial court erred, Uliana relies on cases from other jurisdictions. See *Hill v. Hill*, 356 N.W.2d 49, 55-58 (Minn. Ct. App. 1984) (upholding validity of antenuptial agreement but finding that the maintenance provision was unconscionable under Minnesota law given the wife's poor health, emotional problems, and lack of earning capacity). "The

decisions of foreign courts are not binding on Illinois courts ***." *People v. Applewhite*, 2016 IL App (1st) 142330, ¶ 23. We are persuaded by *Warren* and *Barnes*.

¶ 76                                          iii. Duress and Undue Influence

¶ 77     We next address jointly Uliana's contentions that the circuit court erred in finding that the agreement was not procured under duress or by undue influence, as she raises similar arguments for each issue. She asserts that a confidential relationship existed between her and Leonard, that she was 16 years younger than him, foreign born, a non-native English speaker, from a sheltered background with less education and was physically ill due to her pregnancy when she signed the agreement.

¶ 78     "Duress has been defined as including the imposition, oppression, undue influence or the taking of undue advantage of the stress of another whereby one is deprived of the exercise of his free will." *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 215 (1994). Undue influence is an improper "urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." (Internal quotation marks omitted.) *Kuster v. Schaumburg*, 276 Ill. App. 3d 220, 224 (1995). "The person asserting duress has the burden of proving, by clear and convincing evidence, that he was bereft of the quality of mind essential to the making of the contract." *Hamm-Smith*, 261 Ill. App. 3d at 215.

¶ 79     We find no error in the trial court's determination that Uliana did not enter into the agreement under duress. "One party's agreement to marry is in and of itself sufficient consideration for financial concessions by the other party in the context of a premarital agreement." *Barnes*, 324 Ill. App. 3d at 519. Conditioning marriage on the execution of the agreement did not constitute coercion. *Id.* Both parties could have remained single. Both parties testified that they did not particularly want to marry each other but did so primarily to avoid the stigma attached to having a baby out of wedlock within their religious and cultural traditions. Considering the testimony presented, the trial court's factual determinations were not manifestly erroneous. See *Certain Underwriters at Lloyd's, London*, 2014 IL App (1st) 132020, ¶ 50. According to Uliana's own testimony, she did not want to marry Leonard; she informed Leonard that she wanted to have the baby and she did not "need to be married. *** I am not looking for marriage, but I will not kill another baby." Despite Uliana's assertion on appeal that she was unable to support herself, was dependent on Leonard at the time she executed the agreement, and that she was in "desperate straits, both emotionally and financially," she testified that she told Leonard she was prepared to go ahead with the pregnancy without him. She initially refused to sign the agreement, telling Leonard that "I don't need to marry you. *** I am happy to have a child and to raise a child." Uliana was 29 years old at the time she signed the agreement. She had survived cancer at the young age of 24. She worked her way through college without debt, was making payments on her own automobile, had held several positions of responsibility in the workforce, and was working full time. She had lived in different countries and spoke four languages.

¶ 80     Although Uliana argues that she was ill at the time due to the pregnancy, she nevertheless testified that she was still working. She also obtained a lawyer, had him examine the agreement and explain it to her, and had various revisions and drafts made. Despite Uliana's contention that she did not feel well on the evening she signed the agreement and the wedding occurred, she had several weeks to review it prior to that evening. She received the agreement in

September, reviewed it with her lawyer, had a copy at home, and did not sign it until October. She also conceded that she was presented with the exhibit attached to the agreement that disclosed Leonard's assets, debts, and income. There was no evidence that anyone rushed her to sign the agreement or prevented her from reading it again that evening. In sum, the evidence did not establish that, due to her difficult pregnancy, Uliana was "bereft of the quality of mind essential to the making of the contract." *Hamm-Smith*, 261 Ill. App. 3d at 215. An opposite conclusion is not clearly apparent. See *Certain Underwriters at Lloyd's, London*, 2014 IL App (1st) 132020, ¶ 50.

¶ 81      Uliana contends that she faced tremendous pressure to get married from her father and Leonard's father. However, the testimony from both parties indicated that this pressure did not come from Leonard. He simply presented her with a premarital agreement and stated that they could get married if she signed it. Even if we were to consider the actions of the parties' fathers, "threats cannot constitute duress unless they are legally or morally wrong," (*Barnes*, 324 Ill. App. 3d at 519) and there was no evidence that they did anything legally or morally wrong that would amount to coercing Uliana to sign the agreement. The evidence did not establish that the fathers' attempts to convince their children to marry to avoid having a child out of wedlock deprived Uliana of the exercise of her free will. See *Hamm-Smith*, 261 Ill. App. 3d at 215.

¶ 82      In addition, the agreement itself provided that it had been reviewed by each party with the assistance of counsel of their choice who advised them regarding the agreement and their rights, and it "is believed by them to be fair, just, and equitable with respect to each of them." It provided that the agreement was made and entered into by the parties "consequent to a full, fair, and complete disclosure by each of the said parties to the other of the nature, extent, and value or his or her property, assets indebtedness, and income." Uliana does not dispute that she initialed each page and signed the document. See *Warren*, 169 Ill. App. 3d at 229-30 (finding that the wife signed the premarital agreement knowingly and in absence of any fraud or coercion where she had opportunity to seek legal counsel, the agreement was explained by the husband's counsel prior to signing, she was not inexperienced in the ways of the business world, the husband provided a general disclosure of his financial status, she lived with him and had worked for the same company, the marriage occurred two months after the agreement was executed, and the wife was in good spirits at the time of execution despite her own testimony that she cried on the way to sign the agreement).

¶ 83      In conjunction with her undue influence claim, Uliana asserts that Leonard took advantage of a confidential relationship between them as they were engaged to be married. "Parties engaged to be married, prior to signing a prenuptial agreement, are in a confidential relationship with each other." *In re Marriage of Drag*, 326 Ill. App. 3d 1051, 1056 (2002).

> "[I]f the provisions made for the wife are disproportionate to the extent and value of the husband's estate, the presumption is raised that the husband intentionally concealed his assets, and the burden shifts to those claiming the validity of the agreement to prove that the wife had full knowledge of the husband's property." *In re Estate of Hopkins*, 166 Ill. App. 3d 652, 656 (1988).

However, "[t]his presumption arises only when there is an engagement between the parties, placing them in a confidential relationship." *In re Marriage of Sokolowski*, 232 Ill. App. 3d 535, 543 (1992).

¶ 84       Here, the testimony showed that the parties were cohabitating and Uliana was pregnant, but they were not actually engaged. Moreover, there was no evidence that Leonard used any "confidential relationship" to coerce Uliana into signing the agreement and marrying him. Rather, the testimony showed that the parties did not particularly wish to be married but their families wanted them to because of the pregnancy. Leonard did not propose marriage to Uliana; rather, he informed her that if she would sign a prenuptial agreement, they could marry. Indeed, Leonard testified that he was dating another woman up until the day they signed the agreement and he married Uliana. Thus, Leonard did not have the burden of proving that Uliana was aware of the value and extent of his property. See *id.* At any rate, even if he did, there was no dispute that Leonard provided such a disclosure document attached to the agreement and Uliana had already been living with Leonard for some time and was undoubtedly aware of his financial position. The circuit court's factual determinations in that regard were not manifestly erroneous. See *Certain Underwriters at Lloyd's, London*, 2014 IL App (1st) 132020, ¶ 50.

¶ 85       We note that Uliana asserts that Leonard made last minute changes to the agreement before they signed it. However, based on Leonard's testimony and the copy of the agreement presented to the court, the change he made inured to her benefit and it was initialed by both parties. Leonard increased the number of months Uliana would receive $1000 in maintenance payments from 24 to 36 months if the parties were married for less than 24 months.

                          iv. Fairness and Reasonableness

¶ 86

¶ 87       Uliana asserts that the agreement was not fair and reasonable because $2500 per month for 100 months is insufficient and unfair given her health costs, standard of living, and Leonard's wealth, and the total amount she can receive is capped at $250,000, reduced by any amounts Leonard pays for temporary maintenance or attorney fees to Uliana's counsel.

¶ 88       "Although marriage is sufficient legal consideration for an antenuptial agreement [citation], the agreement must be fair and reasonable. Illinois requires that an antenuptial agreement guarantee both parties an equitable financial settlement in lieu of a waiver of their rights to property or maintenance." *Warren*, 169 Ill. App. 3d at 231.

¶ 89       Uliana likens the present case to the circumstances in *Warren*. There, the court held that although the premarital agreement would not create an unforeseen condition of penury and it was not the product of coercion or fraud, it found the total waiver of maintenance provision in the agreement was not "fair and reasonable" under the circumstances. *Id.* at 231-32. It provided "no financial settlement whatsoever" to the wife, and the couple had enjoyed "a lifestyle far more extravagant than [the wife] could hope to afford on her own" for several years. *Id.* at 231. The wife had not worked since before the marriage and had $33,000 in assets, while the husband was worth $1.5 to $2 million, with $700,000 in debts. *Id.* at 229. In addition, the provision requiring the parties to pay their own attorney fees upon dissolution was not fair and reasonable given the husband's superior financial position and the fact that he instituted the dissolution proceedings. *Id.* at 231; see also *Kolflat v. Kolflat*, 636 So. 2d 87, 90 (Fla. Dist. Ct. App. 1994) (applying Illinois law to hold that while the premarital agreement did not create an unforeseen condition of penury and was not procured by fraud or duress, the maintenance waiver provision was unfair where the husband's net worth was over $4.7 million, while the wife had $109,000 in assets, was over 50 years old, lacked a college education or work skills, and the agreement provided absolutely no financial support to the wife).

¶ 90    In contrast, in *In re Marriage of Burgess*, 138 Ill. App. 3d 13, 15-16 (1985), the court upheld the waiver of maintenance provision in the parties' premarital agreement where the wife had a net worth of over $400,000 before marriage, her husband did not receive any of her premarital assets, she had yearly investment income of over $38,000, and she had sufficient funds to furnish her new household. See also *Drag*, 326 Ill. App. 3d at 1057 (upholding maintenance provision where the wife was receiving over $200,000 in addition to a monthly maintenance award of $1400 for six years).

¶ 91    Considering the circumstances in the present case, we cannot say that the trial court erred in finding the agreement fair and reasonable. The trial court observed that the agreement's financial provisions "may have been on the low side of fair and reasonable but even so especially when coupled with the award of a portion of Leonard Kranzler's estate, given the age differences between the parties, that the Antenuptial Agreement is fair and reasonable." As stated, the agreement did not leave Uliana without a financial settlement and did not involve a complete waiver of maintenance. She was entitled to receive $2500 per month for 100 months because the parties were married for more than 180 months. In addition, she retains her property in Michigan, which has an estimated value of $200,000, and all other premarital property. She is also entitled to half of all jointly titled marital property upon resolution of the dissolution case. We further note that, unlike the wife in *Warren*, who lacked a college education or any specific work skills, Uliana has a college degree and she presently manages four rental properties. As the trial court observed, the agreement also provided that Uliana was entitled to 40% of his net estate upon his death if the parties remain married at the time of death.

¶ 92    We further note that the dissolution case remained pending at the time the circuit court determined the validity of the agreement. The circuit court stated that it was finding the agreement to be valid and enforceable, but noted that it would make further rulings in the future and "hear the condition of the parties in a trial." See *Warren*, 169 Ill. App. 3d at 231; *Burgess*, 138 Ill. App. 3d at 15 (a court may find a premarital agreement valid, but nevertheless modify a maintenance provision it finds unfair or unreasonable in order to mitigate the potential harm to a spouse that could result in the strict enforcement of such provisions if it finds enforcement would result in the spouse becoming a public charge to due lack of resources, "a catastrophic illness or other severe physical or mental impairment").

¶ 93                                        v. Unconscionability

¶ 94    Uliana contends that the agreement is procedurally and substantively unconscionable and the trial court erred in failing to find it unconscionable. As Leonard argues, unconscionability is not part of the common law analysis. See *Berger*, 357 Ill. App. 3d at 656; *Heinrich*, 2014 IL App (2d) 121333, ¶ 49. The trial court made no specific finding as to unconscionability.

¶ 95    However, "[t]he rules governing the interpretation of contracts apply to the interpretation of prenuptial agreements." *Drag*, 326 Ill. App. 3d at 1055. "The test for establishing an unconscionable contract is to determine whether the agreement is one which no reasonable person would make and no honest person would accept." *Id.*

¶ 96    In support of her contention regarding unconscionability, Uliana cites and reiterates the same arguments she made in contending that the agreement was the product of duress and undue influence and was not fair and reasonable. Consistent with our prior analysis regarding these issues, we find that Uliana has not shown that the agreement was so unconscionable such

that it involved "a lack of meaningful choice by one party" under the circumstances. *Id.*

¶ 97                                III. CONCLUSION

¶ 98        For the reasons stated, we affirm the circuit court's order allowing Leonard's motion for declaratory judgment to stand on its own and its order finding the premarital agreement valid and enforceable. The parties' briefs adequately relay their respective contentions and adequately respond thereto, indicating that oral argument would not further our consideration of this appeal.

¶ 99        Affirmed.