2021 IL App (1st) 200739-U

SIXTH DIVISION
September 17, 2021

No. 1-20-0739

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | |
|---|---|
| *In re* THE MARRIAGE OF: | ) |
| | ) Appeal from the |
| JULI L. KELLER, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellant, | ) |
| | ) No. 15 D 230253 |
| and | ) |
| | ) The Honorable |
| GARY R. KELLER, | ) Andrea Schleifer, |
| | ) Judge Presiding. |
| Respondent-Appellee. | ) |

_____

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Circuit court's denial of petitioner's motion to vacate her marriage settlement agreement was not an abuse of discretion and is affirmed. Circuit court's factual findings were not against the manifest weight of the evidence. Circuit court did not abuse its discretion in barring petitioner from certain discovery related to the motion to vacate. Circuit court did not violate petitioner's due process rights in deciding the motion. Petitioner did not show any connection between the circuit court's bifurcation of proceedings and petitioner's signing the marriage settlement agreement.

¶ 2    Petitioner Juli Keller and respondent Gary Keller filed cross-petitions for dissolution of their marriage. The parties eventually entered into a marriage settlement agreement (MSA) that

was incorporated into a judgment for dissolution of marriage entered by the circuit court on May 23, 2019. Juli then unsuccessfully moved to vacate that judgment on the grounds that she had signed the MSA under duress and it was procedurally unconscionable. On appeal, Juli argues that the circuit court (1) erroneously barred her from conducting discovery relating to her motion to vacate, (2) violated her right to due process in deciding that motion, (3) erred in refusing to vacate the judgment dissolving the marriage, and (4) improperly bifurcated the proceedings so that certain matters were decided separately from the judgment for dissolution of marriage. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                            A. Pre-Settlement Proceedings

¶ 5     The Kellers were married on December 31, 1995. On June 17, 2015, Juli filed her petition for dissolution of marriage, and Gary filed his verified counter-petition for dissolution of marriage on July 22, 2017.

¶ 6     Beginning on November 15, 2017, and continuing through the trial, Gary was represented by Todd Warren of Katz Goldstein & Warren, the second lawyer to represent him in this case. Juli went through several changes of attorney, but the most relevant appearance was the one filed on February 13, 2018, by Claire McKenzie and Evan Whitfield of Schiller DuCanto & Fleck, LLP (Schiller). Although the Schiller lawyers moved to withdraw as counsel for Juli on July 31, 2018, they later withdrew this motion. This appeal concerns the events leading up to the settlement.

¶ 7     A trial was scheduled to start on May 20, 2019. Two weeks before trial was to begin, Schiller filed an emergency motion to withdraw as Juli's counsel, alleging "irreconcilable differences." At a hearing on that motion, Judge John Carr told Juli, "I want you to understand, I do not continue trials. So either you're—you're going to try it yourself, you're going to get a

lawyer to try it, or they're going to try it." At that time, Juli insisted that she wanted Ms. McKenzie to continue representing her. Ms. McKenzie indicated to the court that it was inequitable to ask an attorney to represent a client when the client has said that she lacks confidence in her attorney's ability to properly advocate for that client. But Juli again insisted that she wanted Ms. McKenzie to represent her, and the circuit court denied the motion to withdraw.

¶ 8     Four days before trial was to begin, on May 16, 2019, Juli and Gary participated in a settlement conference that ended with them both signing a settlement term sheet. On the following day, and for substantially the same reasons as before, Schiller again moved to withdraw as Juli's counsel. That motion was still pending when the case was transferred to Judge Andrea Schleifer for trial. On May 20, 2019, the day that trial was scheduled to begin, Judge Schleifer heard argument on the motion to withdraw. After a short recess, the judge said to Juli, "[y]our attorneys indicate they don't think that they can represent you based on your communications with them. And I know that a motion to withdraw was filed in front of or heard by Judge Carr. I share his position. I don't continue trials." When Juli told the judge she could not proceed as planned and needed a continuance, the judge responded, "[w]ell, it is either you proceed today or you have the attorneys proceed today. There is not going to be a continuance."

¶ 9     The court then said it understood that the parties had reached an agreement, to which Juli said that she had not had time to let her financial advisor analyze the agreement before she signed it, and when she did take it to her financial advisor, the advisor said "do not agree to this. It will be financially very, very bad for you." Juli represented to the court that she had signed the agreement under duress while crying, and had felt "very coerced," stating: "Everyone said you should just sign it and do this today. And I would not have ever done that if I had not had the opportunity to see a financial advisor first." Juli apologized but said that she could not keep the

agreement.

¶ 10    When the court again asked if Juli would represent herself, Juli said she wanted to be represented by counsel. Ms. McKenzie and Mr. Whitfield were then allowed to take a short recess with their client. Mr. Whitfield then told the court that he and Ms. McKenzie had "had a frank discussion with [Juli] about her obligations to be candid with the Court. And based on those conversations, she is requesting to re-address the Court's prior question." The following exchange then occurred:

"THE COURT: Okay. Ms. Keller, you did, before we were on the record, indicate that you needed time, that you couldn't represent yourself.

[JULI]: That's correct. It is a very complicated case. I am not an attorney.

* * *

MR. WHITFIELD: Just for clarification, your Honor, I believe that you asked her, I don't know if we need it read back, whether or not she wanted us to represent her.

THE COURT: Correct.

MR. WHITFIELD: *** So I still don't believe that question has been posed in a way that she can make an articulate response.

THE COURT: Okay. I will re-ask that question.

[JULI]: I fired my—

THE COURT: I am sorry?

[JULI]: Go ahead. Sorry.

THE COURT: Given the fact that there will be no continuance, do you want these attorneys to conduct the trial on your behalf and represent you?

[JULI]: I don't have any other choice, do I?

MR. WHITFIELD: That's not the question. I want there to be a responsive question—responsive answer. Excuse me.

[JULI]: I cannot have them represent me.

THE COURT: Well, you have only got two choices. One is you represent you. The second choice is they represent you.

[JULI]: I can't represent myself.

* * *

[JULI]: —I asked [Ms. McKenzie] to stay as my lawyer. I said I do not—I said I wanted her to remain my lawyer. I did not want her to withdraw.

THE COURT: Okay.

[JULI]: I have no desire to represent myself.

THE COURT: Okay.

[JULI]: I can't.

THE COURT: But now you do want them to withdraw; is that right?

[JULI]: Not if I don't—not if I have no counsel. I mean, I can't represent myself."

¶ 11   As the hearing continued, Juli told the court she had made a mistake by terminating Schiller, that it had been "a really rash decision," based on miscommunications with the attorneys, and that she apologized for that "bad decision." When the court asked if Juli was reconsidering the termination, both Mr. Whitfield and Ms. McKenzie interjected to make clear that their concerns about violating the rules of professional conduct prevented them from continuing to represent Juli. The court said it would hold them both in direct criminal contempt, stating, "I am not going to let her manipulate the Court through you." Following another recess, the court denied the motion to withdraw.

¶ 12    Just before trial began, Ms. McKenzie and Mr. Whitfield left the courtroom. The court then asked if Juli wanted to proceed on her petition:

"[JULI]: I cannot proceed alone. I have—

THE COURT: I can't hear you.

[JULI]: I can't represent myself alone.

THE COURT: Well, you are representing yourself alone—

[JULI]: Mr. Keller and I have talked about possibly come to some settlement terms, I don't know, rather than me—

THE COURT: We are on trial now. If you would like to come to settlement, you had an opportunity to do that before.

[JULI]: Please, your Honor, I have no—I have no evidence. I have no exhibits. I don't know how to run a case. I have nothing. I beg you to at least let me try to come to some terms and get—have somebody help me.

THE COURT: I am sorry. I am going to strike your petition. And, counsel, ask you to proceed."

¶ 13    Gary's counsel then proceeded on his counter-petition for dissolution. Gary testified to prove-up grounds for the petition, the court found that irreconcilable differences had been established, and the court granted judgment for dissolution, stating "[t]he other matters are bifurcated."

¶ 14    After Gary's counsel had made his opening statement as to those other matters, the court asked Juli if she would like to make one as well, and she said she would not. Gary's counsel then argued motions *in limine* that had been tendered to Juli's counsel that day, on which the circuit court reserved ruling. Gary took the stand to testify but did not complete his direct testimony before

the end of the day.

¶ 15    The following day, May 21, 2019, both Ms. McKenzie and Mr. Whitfield were back in court. Mr. Whitfield informed the court that they had "t[aken] the morning to discuss continuing settlement discussions of the parties," to which Juli responded, "[o]bjection. What we discussed going [*sic*] to trial." Mr. Whitfield then informed the court that Schiller was filing an emergency motion to reconsider the denial of their motion to withdraw as counsel, after which the following exchange occurred:

"[JULI]: Wait. I am sorry. You are withdrawing again?

***

[JULI]: I didn't know. Are you withdrawing again?

MS. McKENZIE: We are asking the Judge to reconsider her denial from yesterday. Yes, yes.

[JULI]: That's news to me. You told me that you wanted to represent me today.

MS. McKENZIE: We have been—we have been. Let us just present our motion.

* * *

[JULI]: I just received notice of this though. It was not—I would have settled if I thought I wasn't going to have co-counsel—I mean counsel for me today."

¶ 16    Juli represented to the court that Ms. McKenzie had e-mailed her that morning to tell her that she and Mr. Whitfield would "totally defend [Juli] again," and that this was the first Juli had heard that they still wished to withdraw. The court took a short recess before denying the motion to reconsider and purging the contempt finding. When Gary's counsel then sought to confirm that there was no settlement agreement between the parties, Ms. McKenzie stated, "[a]ccording to our co-counsel and party, Juli Keller, she is telling us that although I spent time getting a settlement

agreement confirmed or conformed to what I was told that you agreed to, no." The trial resumed, Gary was recalled, and Ms. McKenzie and Mr. Whitfield participated for the remainder of the afternoon, referring to Juli as their "co-counsel."

¶ 17    The following day, May 22, 2019, Mr. Whitfield filed an emergency motion to strike and suspend the trial, on the basis of "some strange and possibly troubling news that happened late last night or early this morning." According to Mr. Whitfield, Juli "reported to us that she was hospitalized at Northwestern" for a stroke and was presently still admitted there. When asked by the court whether Juli's hospitalization had been verified, Mr. Whitfield produced a photograph of a medical bracelet and Ms. McKenzie said she had received an e-mail that morning stating that Juli had been admitted to the hospital. Reiterating its concern that "there [wa]s a specter of manipulation hanging over the circumstances," the court adjourned the proceedings but requested "something from a doctor because just about anybody can walk themselves into a hospital."

¶ 18    That same day, the court entered an order stating that the judgment for dissolution of marriage was "entered and granted on May 20," that it had "bifurcated the property and allocation of some financial issues," and that the parenting allocation judgment was "to be determined during the pendency of the trial."

¶ 19    With Juli back in court the afternoon of May 23, 2019, Gary's counsel stated on the record that the parties had executed an MSA and come to an agreed allocation judgment and parenting plan, all of the documents having been signed and initialed by both parties. Gary testified to prove-up the agreement and then Juli, answering "[y]es" to questions posed by Ms. McKenzie, acknowledged the following: she had discussed possible settlement alternatives with Ms. McKenzie since February 2018; they had reviewed multiple settlement proposals and made responses to Gary's proposals; they had considered the proposals together for many months; she

and Gary had decided to enter into a settlement earlier that day; the two of them had negotiated the final terms of the settlement together; she had determined that it was in her best interests to enter into the settlement; and she had entered into it freely and without force, coercion, or duress.

¶ 20    The terms of the MSA were, generally, as follows: both parties waived maintenance; the division of marital assets included Juli receiving a transfer of $1 million upon entry of the judgment, $1.5 million in $25,000 monthly payments over 60 months, and a balloon payment of an additional $1 million at the end of those 60 months; Gary retained ownership of Windy City Wire and its holding company, Juli Holdings, as his interest in Windy City Wire had been acquired before the marriage; Juli received a quitclaim deed for the Kellers' unencumbered property at 2390 White Oak Drive in Northbrook, Illinois, which the parties stipulated was worth $732,000; Juli also retained the right to reside in the Kellers' other property, 2370 White Oak Drive in Northbrook for up to two years, with Gary maintaining the expenses, and the property would be put up for sale when she chose to move out, at which time the proceeds from that sale—with a stipulation that the property was worth $2.4 million—would be evenly divided; and Juli would receive an additional $75,000 cash payment five days after the agreement was entered, then another $75,000 payment one year after if she was still residing in the shared Northbrook property.

¶ 21    During her findings, the judge said, "I was prepared to proceed with trial, and I did set time aside for the entire week. There were a number of delays, and there were a number of hiccups. This is not the smoothest settlement that I have ever seen." Noting that one party had entered into the agreement freely and voluntarily, and "[t]he other party ha[d] entered it reluctantly but also freely and voluntarily," she nonetheless found that the agreement was "fair, reasonable, equitable, and not unconscionable." The judge then entered a judgment for dissolution of marriage that incorporated the MSA.

¶ 22                          B. Juli's Motion to Vacate the MSA

¶ 23    Less than a month later, on June 20, 2019, Juli, through new counsel, filed a motion to vacate the judgment for dissolution of marriage. Juli alleged that her free will had been "overpowered by individuals who had an obligation to look after her best interests when she was at her most vulnerable," that she had agreed to the MSA under "duress, undue influence, and procedural unconscionability," and that as a result, the MSA should be set aside by the court in the interest of justice.

¶ 24                          1. Juli's Requests for Discovery

¶ 25    On September 4, 2019, Juli served notices of subpoenas for documents and depositions on her former attorneys—Ms. McKenzie and Mr. Whitfield—as well as on Gary and his counsel, Mr. Warren. All four respondents filed motions to quash or object to the subpoenas.

¶ 26    Following extensive argument on Gary and Mr. Warren's motion, the court quashed the subpoena served on Mr. Warren. The court allowed Juli to take Gary's deposition but barred her from inquiring about "the content of any [settlement] negotiations." When Juli's counsel asked whether Gary could be questioned regarding Juli's hospitalization, the court responded:

"[I]f you're asking questions about supposed, her supposed [*sic*] being kept in the hospital when she wasn't kept in the hospital—if anything, she sat in the hospital while they observed her, but they never admitted her, and that's as far as it went, and she didn't bring me the evidence that she was supposed to.

So as far as I'm concerned, she can say, you know, three days from Monday that she was in the hospital. I have been in the hospital, too, watching people go by; it's not the same as being admitted to the hospital.

An alleged letter that she gave me that was unsigned and appears to have been either

photoshopped or just out-and-out created so as to look like it came from a doctor who is not named, doesn't make her be in the hospital any more than her saying that 'I'm in the hospital.' It doesn't mean she was kept in the hospital at all."

¶ 27     At a later hearing on Schiller's motion to quash, the court began by stating, "[w]hile I was in chambers and actually before today, I was considering whether or not discovery would be appropriate at this time since there's really not a question pending unless and until I grant the Motion to Vacate." The court allowed argument to proceed, however, when Juli's counsel pointed out that the present motion was fully briefed and the court had already allowed a limited deposition of Gary. The court ultimately quashed the subpoena, saying "[t]he Appellate Court has said that discovery should be done during the trial. And one doesn't get a second bite of the apple because of things that he or she has failed to do previously." The court then found that there was no "sufficient substance alleged in the Motion to Vacate" that would make the Schiller attorneys witnesses.

¶ 28     Following further argument, the court denied Juli's motion to reconsider these discovery rulings, explaining that the requested discovery was discretionary and the court found it unnecessary. The court stated, "I was here, I was a witness to everything that went on in court and I don't find anything that was in this motion that was previously brought to the Court's attention and the Court proceeded to trial or prove-up anyway."

¶ 29          2. The Hearing on the Motion to Vacate the Dissolution Judgment

¶ 30     A hearing on the motion to vacate was held on April 8, 2020. Juli, still represented by her new counsel, introduced two exhibits: the letter she had submitted to the court, purportedly from a Northwestern doctor, and medical records coinciding with her admission to the hospital on May 21 and 22, 2019.

¶ 31                    a. Juli's Testimony

¶ 32    Juli testified that she had retained Ms. McKenzie and Mr. Whitfield in February 2018. According to Juli, Ms. McKenzie's treatment of her changed beginning in February 2019. Juli testified that Ms. McKenzie became "aggressive and mean," "bullying [her] into settling" when they disagreed about Gary's stock in Windy City Wire. Ms. McKenzie believed that this stock "was definitely non-marital," but Juli disagreed.

¶ 33    Juli testified that she objected to Ms. McKenzie's second motion to withdraw "[b]ecause I needed—I wanted her to continue to represent me." She insisted that, following the hearing on that motion, Ms. McKenzie "wanted [Juli] to go to a deposition without prepping [her]" but finally agreed to go over some questions that Juli would likely be asked by Mr. Warren at the deposition. This conversation lasted "an hour at the most" and Juli said she received no further preparation for her deposition, which was taken on May 10, 2019.

¶ 34    Soon after, on May 16, 2019, Juli participated in a settlement conference at Mr. Warren's office with Gary, Mr. Warren, and Ms. McKenzie. They spent the afternoon negotiating the settlement, and Juli acknowledged that at the end of the meeting both she and Ms. McKenzie initialed and signed the term sheet. Juli testified that later, "[a]fter [she] was able to decide for herself," she notified Ms. McKenzie that she did not, in fact, agree to the settlement terms.

¶ 35    At some point during those settlement negotiations, Juli and Ms. McKenzie left the room, and Juli told Ms. McKenzie that she believed Gary and Mr. Warren "were lying about the Windy City Wire stock" and that it was in fact marital property. Ms. McKenzie disagreed. When Juli continued to express disagreement with settling, she said that Ms. McKenzie "grabbed" her and "said, I'm telling you as your mother to a daughter that this is the best you can do. You should get back in there and take this deal." Juli said she then wanted to walk out, "started to cry a little," and

Ms. McKenzie told her, "if you don't get back in this room right now, I'm going to declare you mentally incompetent." Juli then "started to cry and walked back into the room," at which point she said she "pretty much did whatever [Mr. Warren and Gary] wanted me to do." Mr. Warren told Juli to sign the settlement terms. Juli said she asked Ms. McKenzie if she could take the agreement home to show her financial advisor and was told she could not. Juli signed the settlement, but Ms. McKenzie dated it because Juli was "too upset."

¶ 36    Juli testified that that same evening, she told Ms. McKenzie that she could not believe what had happened and told her, "I am not taking that deal. I want to go to trial." Ms. McKenzie then told Juli that if she wanted to go to trial, she would have to find another attorney.

¶ 37    When Juli received Ms. McKenzie's notice of withdrawal on the following evening, she "was in total shock," and "begged her to reconsider over and over again." According to Juli, Ms. McKenzie instructed her to tell the judge that she had fired Ms. McKenzie, so that Juli could get a new trial date.

¶ 38    Juli testified that she did not meet with her attorneys before she arrived at court on May 20, 2019, and that she was "terrified" and "[s]cared" of appearing in court alone. At the lunch recess after the motion to withdraw was denied, Juli met with Ms. McKenzie and Mr. Whitfield. According to Juli, Ms. McKenzie was "really mad," said, "we're in really big trouble," and instructed Juli to be "much more aggressive with the Judge and tell her, again, that you fired us, and that you need new trial dates." Juli was uncomfortable doing so and begged Ms. McKenzie "all morning" to reconsider the motion to withdraw. After Ms. McKenzie and Mr. Whitfield left the courtroom, Juli said she did not have an opening statement prepared or any exhibits.

¶ 39    Before court the following day, on May 21, 2019, Juli said she again asked Ms. McKenzie to reconsider, to which Ms. McKenzie responded, "yes, we'll see. I'll do the best I can." Juli said

she was "totally shocked" when the Schiller attorneys asked the court to reconsider its denial of their motion to withdraw. During the lunch recess, Juli followed the Schiller attorneys because they were supposed to give her trial exhibits, but in the lobby Ms. McKenzie turned around and screamed at Juli, telling her if she decided to go to trial she was "going down," before walking out. Juli then ran into Gary, who asked her, "what do you expect to happen? The Judge hates you," before getting very close to Juli's face and yelling at her to settle. The Schiller lawyers returned to the courtroom after the lunch recess without Juli's exhibits.

¶ 40    Juli said she left the court at approximately 4 p.m. that day, at which point she "started to feel really sick." She said she slipped and fell in the lobby, and then when she got into her car to go home, "I started to feel worse and started to feel some arm pain, and my neck started to hurt, and I thought something is really wrong." Juli testified that she drove herself to the emergency room at Northwestern Memorial Hospital and within 20 minutes the medial staff began running "several" tests on her. She was in the emergency room for "[m]aybe an hour" before she was transferred to a regular room, where she stayed for 24 hours until she was discharged around 4 or 5 p.m. on May 22, 2019. Juli agreed that when she left, it took her approximately 20 minutes to drive to Northbrook from the hospital. When it was pointed out that it was rush hour, Juli responded, "[t]here was no traffic."

¶ 41    When asked about the letter she had presented to the judge, Juli said only that she had received an e-mail from Ms. McKenzie saying that a diagnosis from a doctor was needed, she then "talked to the doctors," and "they gave [her] a letter to give to [Ms. McKenzie]."

¶ 42    Juli was prescribed Benadryl and Ativan when she was released from the hospital. She understood that the Ativan was intended to calm her because her "blood pressure was really, really high." Juli said the medication made her feel "exhausted and fuzzy and unclear." That evening,

Juli said she was "crying all night long because I didn't have an attorney and just got out of the hospital, and I was worried about the kids and just everything." Juli said that between the hospital tests and her crying, she did not sleep for "probably" 48 hours.

¶ 43    Juli testified that before she returned to court May 23, she e-mailed with Ms. McKenzie, who "said that I should settle, that the Judge hated me pretty much, and did you see the way she was looking at you, and she doesn't—she's not interested in any of your—any reports, any expert depositions or anything." That morning, Juli said she talked to Gary for 10 minutes at most. She specifically denied that they spent "the morning" talking about the settlement.

¶ 44    According to Juli, just before court, Ms. McKenzie pulled Juli aside and said again that she had to settle, that there would be a prove-up, and that Juli "ha[d] to say yes to every single question" that Ms. McKenzie would ask her. Ms. McKenzie passed out copies of the MSA to everyone during a recess but did not review it with Juli. Ms. McKenzie only told Juli to sign the document, which Juli did. Juli acknowledged that she initialed each page of the MSA and signed it, but said she was under duress when she did because she "was crying the entire time about everything that took place in the hallway with [Ms. McKenzie]." Juli also testified that she was "unfocused and extremely weak by then physically" and had to be driven to and from court by a friend because she was "too sick" to drive.

¶ 45    On cross-examination, Juli acknowledged that Ms. McKenzie was the fifth lawyer she had hired to represent her in this matter.

¶ 46                                b. Gary's Testimony

¶ 47    Gary testified that when he arrived at court at approximately 9 a.m. on May 23, 2019, he was approached by Juli just outside the courtroom, where they proceeded to talk "almost the whole time" until noon or 1 p.m. They took periodic breaks to speak with their respective lawyers, and

Mr. Warren, Ms. McKenzie, and Mr. Whitfield "at times" also participated in the negotiations, but Gary estimated that he and Juli spent 75% of the time speaking directly to one another. They "changed some dollar amounts," and at the end, Gary agreed to give Juli "extra cash each year." According to him, "[p]retty much anything she asked for at [that] point, I gave in and gave her."

¶ 48    Gary said the MSA was distributed when they returned to the courthouse after lunch that day. It was not the first time he had seen those documents, however, because they had been negotiating the settlement for a long time. Gary reviewed the terms of the MSA, further revisions were made by Ms. McKenzie, and Gary and Juli then initialed each page and signed the agreement.

¶ 49                    C. The Court's Ruling on the Motion to Vacate

¶ 50    On May 6, 2020, the circuit court presented its findings on the motion to vacate. The court first noted that there had been "lapses in [Juli's] credibility" about what had happened in court and at the hospital. With respect to her hospitalization, the court said:

> "She presented a document to the Court that supposedly was a statement from a doctor at Northwestern, but [from] a simple glance at it one could tell that it, in fact, was either something that had been photo-shopped badly or cut and pasted badly because it was cockeyed, and it didn't have any of the information on the letterhead that is usually and normally at the top of a letterhead from Northwestern Hospital. It didn't have a doctor's name. It had a scribble for a signature that was indecipherable." The court found that Juli "may have had high blood pressure, but it was a different—it was a delay in diversion tactics, and there had been lots and lots of delays." The court also observed that Juli had gone through five sets of attorneys, adding more delay to the case. "She had the opportunity over five years to consult with many different kinds of experts and advisors, financial or otherwise."

¶ 51    Finding no evidence that Juli lacked free will when she entered into the MSA and noting both that "[c]ourts are loath to vacate agreements that parties have reached," and that this was "not an agreement that the parties reached overnight" but rather "something that had been worked on for years," the court denied the motion to vacate. In its 11-page written order, the court explicitly found that Juli's testimony in support of her motion was "not at all convincing or credible." The court again noted that the "settlement agreement was not a slapdash effort, nor boilerplate," but was instead "the product of extensive litigation, written and oral discovery, reports of multiple experts, numerous and lengthy negotiations, and pretrial conferences." The court found that there was no evidence of coercion, that Juli had testified herself that she had "freely and voluntarily signed the agreement," even if reluctantly so, and rejected any suggestion that she had entered into the agreement under duress.

¶ 52                                    II. JURISDICTION

¶ 53    On June 4, 2020, Juli timely filed her notice of appeal from the circuit court's judgment for dissolution of marriage entered on May 23, 2019, and its denial of her motion to vacate that judgment entered on May 24, 2020. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 54                                    III. ANALYSIS

¶ 55    On appeal, Juli argues that the circuit court (1) erroneously barred her from conducting discovery relating to her motion to vacate, (2) violated her right to due process in deciding that motion, (3) erred in refusing to vacate the judgment dissolving the marriage, and (4) improperly bifurcated the proceedings so that certain matters were decided separately from the judgment for dissolution of marriage. Because the other issues would be moot if we found the circuit court erred

in denying the motion to vacate, we begin by considering the propriety of that ruling.

¶ 56     A. The Circuit Court Did Not Abuse Its Discretion in Denying Juli's Motion to Vacate

¶ 57     Juli argues that the circuit court erred in denying her motion to vacate because its finding that she did not sign the MSA under duress was against the manifest weight of the evidence. While we review a circuit court's finding of whether there was duress under a manifest-weight-of-the-evidence standard (*In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 41), the ultimate ruling on a motion to vacate is reviewed for an abuse of discretion (*Higgens v. House*, 288 Ill. App. 3d 543, 546 (1997)). "A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, and not based on the evidence." *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 101. An abuse of discretion occurs when a court's "ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710, ¶ 39.

¶ 58     Juli first argues that in this case the circuit court improperly disregarded her uncontradicted and unrebutted testimony. As the trier of fact, the circuit court "is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995). We defer to the circuit court on credibility findings because it is in the best position to observe the conduct and demeanor of the parties and witnesses," and a reviewing court will not substitute its judgment for the circuit court's determinations of credibility of the witnesses, the weight to be given the evidence, or the inferences to be drawn from either. *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). However, the circuit court may not wholly discount the testimony of a witness "unless it was impeached, contradicted by positive testimony or by circumstances, or found to be inherently

improbable." *Bucktown Partners v. Johnson*, 119 Ill. App. 3d 346, 353 (1983).

¶ 59    A review of the entire record shows that the circuit court's disbelief of Juli's testimony was not against the manifest weight of the evidence. Portions of Juli's testimony were in fact either contradicted by positive testimony (*i.e.*, Juli testified that she and Gary spoke for 10 minutes at most the morning of May 23, 2019, while Gary testified that they spoke on and off for 4 hours) or inherently improbable (*i.e.*, that Juli was able to drive from the hospital to Northbrook in 20 minutes during rush hour). Furthermore, the court was free to consider the circumstances of Juli's conduct throughout the proceedings, including her interactions with the court itself and with her lawyers in the court's presence, when making its credibility determinations. See *Best*, 223 Ill. 2d at 350 (the circuit court is in the best position to observe the parties' conduct); see also *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002) ("opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible" (internal quotation marks omitted)). On this record, we cannot say that the circuit court's finding that Juli was not a credible witness was an abuse of discretion.

¶ 60    Turning to the substance of the circuit court's ruling, Juli contends that the evidence showed that the settlement agreement was a product of duress. Generally, "[w]hen a party seeks to vacate a property settlement incorporated in a judgment of dissolution of marriage, all presumptions are in favor of the validity of the settlement." *In re Marriage of Gorman*, 284 Ill. App. 3d 171, 180 (1996). A settlement may, however, be set aside if it is shown that the agreement was procured through, as relevant here, duress or unconscionability. *Id.*

¶ 61    "Duress has been defined as including the imposition, oppression, undue influence or the

taking of undue advantage of the stress of another whereby one is deprived of the exercise of free will." (Internal quotation marks omitted.) *Kranzler v. Kranzler*, 2018 IL App (1st) 171169, ¶ 78. "Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows the execution of the contract or other instrument is not the voluntary act of the maker." (Internal quotation marks omitted.) *Regenold v. Baby Fold, Inc.*, 68 Ill. 2d 419, 433 (1977). "[D]uress is measured by an objective test, rather than a subjective one." *In re Marriage of Tabassum and Younis*, 377 Ill. App. 3d 761, 775 (2007). "The person asserting duress has the burden of proving, by clear and convincing evidence, that he [or she] was bereft of the quality of mind essential to the making of the contract." (Internal quotation marks omitted.) *Id.*

¶ 62    On the record before us, and even taking all of Juli's testimony about her treatment by her attorneys and her hospitalization as true, we simply do not find clear and convincing evidence that Juli signed the MSA under duress. Juli's allegations of duress boil down to the following: her attorneys threatened to declare her mentally incompetent, told her she would have to find other counsel, and told her she was "going down" if she did not settle, they refused to let her show the proposed settlement to a financial advisor, they deserted her the first day of trial, they attempted to withdraw again on the second day of trial, Juli drove herself to the hospital and was admitted for 24 hours, when Juli returned to court she was medicated, Juli's attorneys did not go over the settlement agreement with her, and Ms. McKenzie told her to say "yes" to all the questions posed during the prove-up.

¶ 63    We acknowledge that Juli likely experienced a great deal of anxiety, stress, and strain throughout this process. But "[b]ecause stress is common in dissolution proceedings, stress alone is not enough." *In re Gibson-Terry and Terry*, 325 Ill. App. 3d 317, 327 (2001). On May 20, 2019, when Juli was forced to go to trial without her attorneys, what she was experiencing might have

risen to the level of duress. But, of course, the MSA was not signed on that day. Moreover, Juli had been warned almost two weeks before trial—at the hearing on Schiller's first motion to withdraw on May 7, 2019—that she would not be granted a continuance even if she was without representation. Thus, to the extent that Juli found herself in an untenable situation on that day, much of that was of her own making. Moreover, between May 20, when she found herself alone in court, and May 23, when she signed the MSA, her attorneys were present and making objections to questions asked during Gary's testimony, and she continued to be represented through the time she signed the MSA.

¶ 64    In addition, it is clear that the parties in this case had been working on negotiating the settlement for some time, long before the very stressful day that Juli was in court on May 20, 2019. Gary testified that at the prove-up that he had seen multiple copies of the MSA, as it had gone through multiple revisions while they spent what his attorney referred to as "the last couple of months" negotiating.

¶ 65    This court has found that "[w]here consent to an agreement is secured merely because of hard bargaining positions or financial pressures, duress does not exist." *Wallenius v. Sison*, 243 Ill. App. 3d 495, 503 (1993). In addition, "[i]n all settlement agreements there is a compromising of claims. No party obtains what he alleges to be equitably his. Parties agree to accept less than their full claim in lieu of foregoing litigation." (Internal quotation marks omitted.) *Id.* "[T]hreats cannot constitute duress unless they are legally or morally wrong." (Internal quotation marks omitted.) *Kranzler*, 2018 IL App (1st) 171169, ¶ 81. We cannot find that the circuit court's factual finding that Juli did not sign the MSA under duress was against the manifest weight of the evidence.

¶ 66    Juli relies heavily on *In re Marriage of Moran*, 136 Ill. App. 3d 331 (1985), in support of her position that it was against the manifest weight of the evidence to find that she was not under

duress when she signed the MSA. That case is, however, distinguishable, as the plaintiff there had "*no* input into the drafting of the settlement agreement" (emphasis added) and continually objected to the agreement from the time it was presented to her, her attorney threatened to quit for the *first time* on the eve of trial, and the agreement included a $25,000 payment to her attorney from the defendant upon her signing that the court deemed "quite excessive when considering the relatively small amount of time and effort [he] exerted on [the plaintiff's] behalf." *Id.* at 336-37. The reviewing court in *Moran* also found that the circuit court in that case misled the petitioner regarding the applicable law. *Id.* at 338-39.

¶ 67    Here, in contrast, there was evidence that supported the trial court's finding. Not only was Juli involved in multiple settlement negotiations, but she and Gary also worked on the settlement terms for a couple of months and talked about them for four hours the day she signed, Ms. McKenzie and Mr. Whitfield attempted to withdraw almost two weeks before trial and Juli was on notice that she would not receive a trial continuance, and Juli's attorneys spent more than just a "relatively small amount of time" on the case. *Moran* does not persuade us that a different result is warranted here.

¶ 68    Juli also argues that the agreement itself was unconscionable. "The term unconscionability includes an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *In re Marriage of Arjmand*, 2013 IL App 2d 120639, ¶ 30. There are two types of unconscionability, procedural and substantive. *Id.* Procedural unconscionability, which is primarily what Juli asserts here, involves "impropriety during the process of forming a contract that deprives a party of [a] meaningful choice." (Internal quotation marks omitted.) *Id.* "Factors to be considered in determining whether an agreement is procedurally unconscionable include all of the circumstances

surrounding the transaction, the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Woodrum*, 2018 IL App (3d) 170369, ¶ 89. In contrast, substantive unconscionability "refers to terms that are 'inordinately one-sided in one party's favor.' " *Id.* ¶ 95 (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006)).

¶ 69    We do not find procedural unconscionability in this case for many of the same reasons that we do not find that Juli was under duress: the parties and their lawyers had been negotiating a settlement for a couple of months, Juli was represented by counsel after the first day of trial and at the time of the final settlement negotiations, and Juli and Gary negotiated for several additional hours on the day the MSA was signed. Even in light of the less-than-ideal circumstances for Juli— her time in the hospital and the fact that her attorneys had attempted to withdraw from representing her and left her to fend for herself on the first day of trial—we cannot say that she was deprived of meaningful choice when she signed the MSA two days later.

¶ 70    Finally, for the first time in her reply brief, Juli argues that the contract terms here unreasonably favorable Gary. Juli did not argue, however, that the MSA was substantively unconscionable before the circuit court and did not even raise the issue in her opening brief on appeal. She has accordingly forfeited this argument. See *Hebert v. Cunningham*, 2018 IL App (1st) 172135, ¶ 37 (claims "not raised before the circuit court are forfeited and cannot be raised for the first time on appeal"); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Furthermore, regardless of any forfeiture, on this record we could not conclude that the terms of this settlement—under which Juli ultimately received over $3.5 million, an unencumbered property worth $732,000, and half of the proceeds from the sale of another property valued at $2.4

million—were substantively unconscionable.

¶ 71    Considering all of the above, we find the circuit court's conclusions that Juli was not under duress when she signed the MSA and that the MSA was not unconscionable were not against the manifest weight of the evidence. The court thus did not abuse its discretion when it denied her motion to vacate the MSA.

¶ 72                    B. Discovery Supporting Juli's Motion to Vacate

¶ 73    Juli argues that the circuit court erred in barring her from conducting discovery to support her motion to vacate. Generally, a circuit court's discovery ruling is reviewed for an abuse of discretion. *People ex rel. Madigan v. Stateline Recycling, LLC*, 2020 IL 124417, ¶ 37. Juli argues that here, however, our review should be *de novo* because it involves review of the court's interpretation of a statute. See *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 17 (issues of statutory interpretation are reviewed *de novo*).

¶ 74    According to Juli, the circuit court "misconstrued" section 2-1203 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-1203 (West 2018)), which governs post-judgment motions in non-jury cases, when it prevented her from taking discovery in connection with her motion to vacate. Section 2-1203 provides:

> "In all cases tried without a jury, any party may, within 30 days after the entry of judgment or within any further time the court may allow within the 30 days or any extensions thereof, file a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief." 735 ILCS 5/2-1203(a) (West 2018).

¶ 75    Juli insists that the circuit court was required to hear evidence on the petition to vacate because the language of the statute does not limit post-trial motions only to legal argument. We agree with Juli that the statute does not preclude an evidentiary hearing. However, the statute does

not require such a hearing. In fact, "[t]his court has long held that [post-trial] motions may be decided on the basis of affidavits alone." *In re Marriage of Varco*, 158 Ill. App. 3d 578, 580 (1987).

¶ 76    Moreover, in this case, the circuit court did hold an evidentiary hearing. The fact that the hearing was not as extensive as Juli would have liked and that broad discovery was not permitted does not mean that the court misinterpreted section 2-1203. We are unconvinced that this issue has anything to do with statutory interpretation, and thus our review is for an abuse of discretion.

¶ 77    This court has made clear that while post-trial discovery is permitted, it "should only be allowed in limited circumstances," and whether to allow such discovery is "within the trial court's sound discretion." *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387, 398 (2002).

¶ 78    Juli's argument relies heavily on this court's pronouncement in *In re Marriage of Giammerino*, 81 Ill. App. 3d 998 (1980), that "[a]n evidentiary hearing, including the right to present witnesses and engage in cross-examination, must be given if properly requested in domestic relations cases." *Id.* at 999. While the *Giammerino* case does use this broad language, Juli takes it out of context. There is no general rule in domestic relations cases that any evidentiary hearing must be held on a motion to vacate a settlement. The *Giammerino* case itself (although not the cases it cites) was an appeal from the denial of a motion to vacate a divorce settlement. However, the reason that we found that the circuit court in that case erred by not providing the respondent with an evidentiary hearing on his motion to vacate was that his affidavit sufficiently alleged that the settlement erroneously included nonmarital property. *Id.* at 999-1000. This obviously presented a significant factual issue, which could require a hearing.

¶ 79    In any event, an evidentiary hearing was held here and the *Giammerino* case has nothing to say about the scope of discovery to be allowed prior to such a hearing. Moreover, the motion to vacate in this case does not present the kind of concrete issue that was raised in the *Giammerino*

motion to vacate. Here, Juli claimed that the settlement should be set aside because she signed it under duress, a claim that was largely dependent on her own testimony and, as the court noted, the in-court activities of the parties, which the court itself had observed. There is simply no basis for a finding that the circuit court's conclusion that further discovery was not necessary was an abuse of its discretion.

¶ 80          C. The Circuit Court Did Not Violate Juli's Right to Due Process

¶ 81    Juli argues that the circuit court violated her right to procedural due process. "Procedural due process generally refers to notice and the opportunity to be heard," and the rights involved include "a right to present evidence and argument, a right to cross-examine witnesses, and impartiality in rulings upon the evidence which is offered." *Fischetti v. Village of Schaumburg*, 2012 IL App (1st) 111008, ¶ 16.

¶ 82    Juli argues that the circuit court violated her due process rights by erroneously (1) prejudging her motion, as evidenced by the court's comments that it had been a "witness to everything that went on in court," that it did not "find anything in [the] motion that wasn't previously brought to the Court's attention," and that the motion was a "waste of the Court's time," (2) refusing to allow her to call third-party witnesses, (3) finding her testimony to be not credible, and (4) relying on extrajudicial evidence when it refused to believe that she was hospitalized.

¶ 83    We begin by noting that Juli seems to be using these due process arguments as a way to reargue the substance of the court's denial of her motion to vacate. We have already concluded that the court did not abuse its discretion, either in refusing to vacate the MSA or in denying Juli's request for additional discovery. We have likewise already concluded that the court's finding that Juli was not a credible witness was not against the manifest weight of the evidence. This court has previously held that "[a] failure to receive evidence does not constitute a denial of due process"

and, as we noted earlier, "motions may be decided on the basis of affidavits alone." *Varco*, 158 Ill. App. 3d at 580. The court's comments on the record regarding Juli's motion also do not amount to a violation of due process, where the court ultimately did hold a hearing and receive testimony from both Juli and Gary.

¶ 84    Juli also argues that the circuit court's conclusion that the letter she provided the court—purportedly from one of the doctors at Northwestern—was inauthentic, was not based on the evidence but instead was based on the court's "preconceived notion of how a doctor's note should appear," and that its determination was "unreasonable since [it] received Juli's entire medical record from the hospitalization in evidence." But "[a] trial judge does not operate in a bubble; she may take into account her own life and experience in ruling on the evidence." *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007) (citing *People v. Tye*, 141 Ill. 2d 1, 23-24 (1990)). Moreover, this is not a matter of due process, but one of the credibility of evidence, and "[a] trial court's ruling on an evidentiary matter will not be reversed absent an abuse of discretion." *Gunn v. Sobucki*, 352 Ill. App. 3d 785, 789 (2004).

¶ 85    We find no such abuse of discretion here. The letter at issue is included in the record on appeal, we have reviewed it, and we understand the circuit court's reticence to accept it as genuine. The letter appears to be photocopied, the "Northwestern Medicine" logo in the upper-right-hand corner is crooked, and although there is a signature, the signature is illegible and unaccompanied by any typed rendition of that individual's name. The letter also indicates that the hospital's neurology department believed Juli may have had a stroke and that Juli would "need to be monitored for further evaluation until further notice," even though the letter is dated the same day that Juli was discharged.

¶ 86    Juli did eventually supply her medical records from her hospitalization to the court, but

even those records make clear only that she underwent many tests while she was at the hospital. They do not, at least to a lay person, provide a diagnosis. All of this is, in any event, rather beside the point, as we have already concluded that even taking Juli's testimony about her hospitalization as true, that would still not be enough to show that the circuit court's denial of her motion to vacate was an abuse of discretion.

¶ 87    None of the arguments that Juli makes rise to the level of a due process violation and we will not reverse the circuit court's denial of her motion to vacate on that basis.

¶ 88                              D. The Bifurcation Was Harmless Error

¶ 89    Juli's final argument is that the circuit court erred by first entering the dissolution judgment and reserving the remaining issues for a bifurcated trial.

¶ 90    Section 403(e) of the Act provides, in part, that "[e]xcept as provided in subsection (b) of Section 401, the court shall enter a judgment of dissolution of marriage, including an order dissolving the marriage, incorporation of a marital settlement agreement if applicable, and any other appropriate findings or orders, only at the conclusion of the case." 750 ILCS 5/403(e) (West 2018). Section 401(b) provides:

> "Judgment shall not be entered unless *** the court has considered, approved, reserved or made provision for the allocation of parental responsibilities, the support of any child of the marriage entitled to support, the maintenance of either spouse and the disposition of property. The court shall enter a judgment for dissolution that reserves any of these issues either upon (i) agreement of the parties, or (ii) motion of either party and a finding by the court that appropriate circumstances exist." *Id.* § 401(b).

¶ 91    In this case, the circuit court entered the judgment for dissolution on May 20, 2019, and bifurcated the remaining matters without an agreement of the parties and without either party

moving for the bifurcation. Gary does not argue that this was proper, but instead argues that Juli forfeited this claim since she did not object at the time of bifurcation. However, at the time of bifurcation, Juli was without counsel in court to represent her, which makes us hesitant to find any forfeiture. Moreover, even if we assume that the bifurcation was an error by the circuit court, Juli has not explained how this bifurcation caused her to enter the MSA. Since Juli has made no connection between this claimed error and the relief she seeks, we find no grounds for reversal.

¶ 92                                    IV. CONCLUSION

¶ 93    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 94    Affirmed.